# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x
:
**In re:** : **Chapter 11**
:
**OTC HOLDINGS CORPORATION,** : **Case No. 10-12636(___)**
*et al.*,[1] :
    **Debtors.** : **Joint Administration Pending**
:
------------------------------------------------------------ x

## DECLARATION OF STEVEN G. MENDLIK IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Steven G. Mendlik, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information and belief:

1. I am the Chief Financial Officer and Senior Vice President of Finance of Oriental Trading Company, Inc. ("OTC"), a debtor herein, and I am familiar with the day-to-day operations, business and financial affairs of OTC and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (collectively, the "Debtors").

2. On the date hereof (the "Commencement Date"), concurrently with the filing of this declaration (this "Declaration"), the Debtors have filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: OTC Holdings Corporation, a Delaware corporation (0174); Oriental Trading Company, Inc., a Delaware corporation (5603); OTC Investors Corporation, a Delaware corporation (0180); Fun Express, Inc., a Nebraska corporation (7942); and Oriental Trading Marketing, Inc., a Nebraska corporation (0923). The location of the Debtors' corporate headquarters and the service address for all the Debtors is 5455 South 90th Street, Omaha, Nebraska 68127.

management and the Debtors' advisors, my review of relevant documents or my opinion based on my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4. This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. Part I of this Declaration provides an overview of the Debtors' business and corporate history. Part II provides a description of the Debtors' organizational and capital structures. Part III provides a discussion of the events that compelled the commencement of these chapter 11 cases. Part IV affirms and incorporates by reference the facts that support the relief requested in "first day" applications and motions filed with the Court (collectively, the "First Day Motions").

## PART I
### Business and Corporate History

#### General

5. The Debtors are the largest direct marketers and internet retailers of party supplies, novelties, toys and children's arts and crafts in the United States. The Debtors are also the leading direct marketers of school supplies and value-priced home décor and giftware in the United States. The Debtors market their merchandise to various customer segments, including individual consumers, teachers, schools, churches, non-profit organizations and businesses.

6. The Debtors market through catalogs and three websites and have extensive in-house merchandise and design expertise to continuously renew their products and expand their categories of products. The Debtors maintain a low-cost overseas sourcing network that was built over decades. They also have a call center to support customer service and warehouse and processing space to provide their products to customers efficiently.

7.  The Debtors' executive offices are located in Omaha, Nebraska. The Debtors own all of their principal facilities, including storage and processing facilities and call centers, except for a storage and processing facility in La Vista, Nebraska.

**History**

8.  The Debtors were founded by Harry Watanabe in 1932 in Omaha, Nebraska as a single-store wholesale gift shop selling Japanese-imported merchandise, such as lacquer ware and porcelain dolls, primarily to the carnival trade. By 1952, the Debtors had become significant suppliers of redemption prizes for carnival games with over 1,000 products. To expand the business nationally, in 1956, Mr. Watanabe began to market through a price list and catalog.

9.  Beginning in 1986, the Debtors accelerated growth by focusing on the consumer market. The Debtors introduced color photographs, added titles for seasonal offerings, expanded product selection and eventually added a 1-800 number to the call center. In 1999, the Debtors launched an e-commerce enabled website.

10. In 2000, the founding family sold most of its equity in the Debtors to Brentwood Associates, a private equity firm, and its affiliates ("Brentwood").

**Recapitalization**

11. On July 31, 2006, certain affiliates of The Carlyle Group ("Carlyle"), a Washington, D.C.-based private equity firm, invested approximately $260 million to acquire approximately 68% of the equity of OTC Holdings Corporation ("Holdings"), one of the Debtors, from Brentwood. Through a new fund, Brentwood (together with Carlyle, the "Sponsors") invested an additional $90 million to acquire approximately 24% of the equity of

Holdings. The remaining 8% of the equity of Holdings was retained by management of the Debtors.

**Products and Seasonality**

12. The Debtors sell party supplies, novelties, toys, children's arts and crafts, school supplies and value-priced home décor and giftware. Customers purchase the Debtors' products for various occasions, including holidays, birthdays, school, church and community events, company gatherings and other celebrations as well as everyday gift giving. While the majority of total sales are derived from everyday products, seasonal and holiday themed products represent a large portion of sales and are an important impetus driving customers to purchase the Debtors' products.

13. The Debtors' merchandising staff is responsible for product sourcing, new product development, assortment planning, catalog and website merchandising and product pricing. Through a team of product designers the Debtors design a significant portion of their merchandise in-house with a typical design to production cycle of four to six months. Only a small fraction of the merchandise offered by the Debtors is sold pursuant to license agreements. The Debtors source a vast majority of their merchandise from outside the U.S., primarily from Asia. Substantially all of the Debtors' transactions are conducted in U.S. dollars.

**Customers**

14. The Debtors serve four distinct customer segments: individual consumers, education/non-profit organizations, businesses and national accounts.

15. <u>Consumers</u>. The Debtors market to individual consumers primarily through the Oriental Trading Company and Terry's Village catalogs. A typical individual

consumer is female, 45 years old, married, has children and has a household income of more than $50,000.

16. <u>Education/Non-profit</u>. The education/non-profit segment includes schools, teachers, churches, day care providers, youth organizations and fundraising groups. Education/non-profit customers purchase products for a wide variety of purposes such as classroom rewards and decorations, curriculum enhancements and celebratory events such as school carnivals.

17. <u>Businesses</u>. The Debtors target business customers, such as company event planners, business owners, party supply stores and other retailers, with its OTC – Business Edition catalogs. These customers purchase for customer and employee recognition programs, office decorating, company events and resale.

18. <u>National Accounts</u>. Fun Express, Inc. ("<u>Fun Express</u>"), one of the Debtors, services large commercial customers. National accounts include a variety of businesses that use products for resale through their retail outlets, in their redemption businesses and as promotional premiums.

**E-Commerce**

19. E-commerce is a natural extension of the Debtors' catalog marketing model. E-commerce takes advantage of many aspects of the Debtors' business, including a large number of catalogs mailed, the efficient operating infrastructure and the strong brand loyalty. The Debtors maintain three websites: (<u>i</u>) www.orientaltrading.com, through which OTC merchandise is sold, (<u>ii</u>) www.terrysvillage.com, through which Terry's Village merchandise is sold and (<u>iii</u>) www.funexpress.com, through which OTC merchandise for national accounts is sold. The websites provide convenience to customers by accepting orders 24 hours a day, seven

5

days per week, with online access to order status, providing a powerful search function and allowing them to control the order entry process.

**Employees**

20. As of the Commencement Date, the Debtors have approximately 1,252 hourly employees and approximately 417 salaried employees in their corporate headquarters, fulfillment centers, call centers and other facilities. As of the Commencement Date, the Debtors have approximately 1,478 employees who are scheduled to work at least 30 hours a week while less than 5% of the employees are temporary, consulting or seasonal employees. During the peak order season of October through December, the Debtors hire additional staff to meet seasonal demand. None of the Debtors' employees are currently covered by a collective bargaining agreement.

**Recent Financial Information**

21. For the fiscal year ended April 3, 2010, the Debtors' audited consolidated financial statements reflected assets totaling approximately $463.3 million, liabilities totaling approximately $756.6 million and net sales of approximately $485.4 million.

## PART II
## Organizational and Capital Structures

**Organizational Structure**

22. As set forth on the organization chart attached hereto as Exhibit A, Holdings owns all of the outstanding equity of OTC Investors Corporation ("Investors"), which in turn owns all of the outstanding equity of OTC. OTC owns all of the outstanding equity of Fun Express and Oriental Trading Marketing, Inc. ("Marketing"). Other than Fun Express and Marketing, both of which are Nebraska corporations, all of the other Debtors are Delaware corporations. All business operations of the Debtors are carried out by OTC and Fun Express.

6
YCST01:10086137.1                                                        069486.1001

### Capital Structure

23. As of the Commencement Date, 154,696 shares of common stock of Holdings and 363,865 shares of preferred stock of Holdings are outstanding. Of these, 257,665 shares of preferred stock and 10 shares of common stock (together representing approximately 68% of the outstanding shares of common stock of Holdings on an as-converted basis) are owned by Carlyle and 90,000 shares of preferred stock (representing approximately 24% of the outstanding shares of common stock of Holdings on an as-converted basis) are owned by Brentwood. The management of the Debtors owns the remaining 8% of the outstanding shares of common stock of Holdings (on an as-converted basis).

24. <u>First Lien Credit Agreement</u>. On July 31, 2006, OTC entered into the First Lien Credit Agreement (as amended, supplemented and otherwise modified from time to time, the "<u>First Lien Credit Agreement</u>") with JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (the "<u>First Lien Agent</u>"), and the lenders from time to time party thereto (the "<u>First Lien Lenders</u>").

25. The First Lien Credit Agreement provides for a term loan facility in the original aggregate principal amount of $410 million and a revolving loan facility in the original aggregate amount of $50 million (including a $20 million letter of credit sub-facility), which revolving credit commitment was reduced to $15 million (including the letter of credit sub-facility) on March 25, 2010.

26. Pursuant to the First Lien Guarantee and Collateral Agreement, dated as of July 31, 2006 (as amended, supplemented and otherwise modified from time to time, the "<u>First Lien Guarantee and Collateral Agreement</u>"), Investors, Fun Express and Marketing guaranteed the obligations of OTC under the First Lien Credit Agreement. In addition, pursuant to the First

Lien Guarantee and Collateral Agreement, and related security agreements and mortgages executed pursuant to the First Lien Credit Agreement, the obligations under the First Lien Credit Agreement are secured by first priority liens on substantially all of the assets of each of OTC, Investors, Fun Express and Marketing, including a pledge of all of the shares of OTC, Fun Express and Marketing.

27.  As of the Commencement Date, and excluding the "LIFO Loans" discussed below, the aggregate principal amount outstanding under the term loan facility of the First Lien Credit Agreement is $383.6 million. Additionally, as of the Commencement Date, approximately $13.0 million of revolving loans and approximately $1.9 million of letters of credit are outstanding under the First Lien Credit Agreement. In addition, OTC is party to interest rate swap agreements entered into in connection with the First Lien Credit Agreement, under which OTC would be obligated for a termination amount of approximately $5.1 million if such agreements had been terminated as of the Commencement Date. Accordingly, the aggregate principal amount outstanding under the First Lien Credit Agreement and related documents is approximately $403.6 million in respect of loans made, letters of credit issued and interest rate hedges provided, by the First Lien Lenders, plus accrued and unpaid interest, consent and other fees, costs and expenses.

28.  <u>Second Lien Credit Agreement</u>. On July 31, 2006, OTC entered into the Second Lien Credit Agreement (as amended, supplemented and otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>") with Wilmington Trust FSB (as successor agent to Wachovia Bank, National Association), as administrative agent and collateral agent (the "<u>Second Lien Agent</u>"), and the lenders from time to time party thereto (the "<u>Second Lien Lenders</u>"). The

Second Lien Credit Agreement provides for a term loan facility in the aggregate principal amount of $180 million, which matures on January 31, 2014.

29. The obligations under the Second Lien Credit Agreement are guaranteed by Investors, Fun Express and Marketing and secured by second priority liens on substantially all of the assets of each of OTC, Investors, Fun Express and Marketing, including a pledge of all of the shares of OTC, Fun Express and Marketing, junior to the liens granted to the First Lien Agent under the First Lien Guarantee and Collateral Agreement. As of the Commencement Date, $180 million in principal amount and approximately $6 million in accrued but unpaid interest are outstanding under the Second Lien Credit Agreement.

30. <u>Intercreditor Agreement</u>. The First Lien Agent, on behalf of the First Lien Lenders, and the Second Lien Agent, on behalf of the Second Lien Lenders, together with the Debtors, entered into the Intercreditor Agreement dated as of July 31, 2006 (as amended, supplemented and otherwise modified from time to time, the "<u>Intercreditor Agreement</u>") in connection with the First Lien Credit Agreement and the Second Lien Credit Agreement. The Intercreditor Agreement governs the priority, and the parties' respective rights in respect, of the First Lien Agent's and the Second Lien Agent's respective security interests in and liens on the common collateral pledged to such parties by the Debtors. Pursuant and subject to the Intercreditor Agreement, prior to the indefeasible payment in full in cash of all amounts owing to the First Lien Lenders, the Second Lien Lenders waived certain rights to exercise remedies with respect to the common collateral, are subject to the turnover provisions contained therein, and consented to other matters applicable in the context of a chapter 11 proceeding relating to, among other things, post-petition financing, the use of cash collateral, any sale of assets and the terms of any plan of reorganization.

31.     Mezzanine Loan Agreement. On July 31, 2006, Investors entered into the Mezzanine Loan Agreement (as amended, supplemented and otherwise modified from time to time, the "Mezzanine Loan Agreement") with Wilmington Trust FSB (as successor agent to Wachovia Bank, National Association), as administrative agent, and the lenders from time to time party thereto (the "Mezzanine Lenders"). Investors is a holding company whose only asset is the stock of OTC, and the obligations of Investors under the Mezzanine Loan Agreement are not secured and are not guaranteed by any of the other Debtors.

32.     The Mezzanine Loan Agreement provides for a term loan facility in the original aggregate principal amount of $70 million, which matures on January 31, 2015. Loans accrue interest at a rate equal to 13.50% per annum and interest is paid by capitalizing such interest as additional loans until January 1, 2011. As of the Commencement Date, the aggregate principal amount outstanding under the Mezzanine Loan Agreement is approximately $120 million.

## PART III
## Events Leading to the Chapter 11 Filing

33.     The Debtors have experienced and continue to experience financial difficulties due primarily to a severe economic downturn that has adversely affected retail markets and consumer confidence. As a result of the economic downturn, the Debtors' revenues have declined and their operations can no longer support their highly-leveraged capital structure. To assist in addressing the Debtors' leveraged capital structure, in November 2008, the Debtors retained Jefferies & Company, Inc. ("Jefferies") as their financial advisor.

34.     As a result of their declining results of operations and leveraged capital structure, the Debtors failed to satisfy certain financial covenants set forth in the First Lien Credit Agreement with respect to the fiscal quarter ended on December 27, 2008. To afford the Debtors

10
YCST01:10086137.1                                                                                               069486.1001

time to stabilize their operations and formulate a restructuring plan (including a possible new investment from their principal shareholders) and continued access to the revolving credit facility under the First Lien Credit Agreement, the Debtors and the First Lien Lenders entered into a series of waivers and amendments with respect to the First Lien Credit Agreement and certain related agreements and, on May 1, 2009, entered into a longer term waiver and amendment pursuant to which the First Lien Lenders agreed to waive compliance with these financial covenants through April 4, 2010. This waiver was subsequently extended to August 25, 2010 through several further waivers and amendments with the First Lien Lenders to permit the Debtors continued access to the revolving credit facility under the First Lien Credit Agreement while, as described below, the Debtors pursued a consensual restructuring with the Steering Committee and the Ad Hoc Committee (each as defined below) and explored the potential sale of the Debtors. In addition, in connection with the final waiver and amendment under the First Lien Credit Agreement, and as the Debtors' liquidity grew extremely tight in the days leading up to the Commencement Date, the First Lien Lenders made $2.5 million of "LIFO Loans" to the Debtors on August 23, 2010 as an accommodation to provide the Debtors with sufficient liquidity pending obtaining the DIP Facilities to permit the Debtors to enter chapter 11 in as smooth and orderly a fashion as possible under the circumstances.

35. In April 2010, with a view to formulating a consensual restructuring plan to delever the Debtors' balance sheet, the Debtors and their advisors initiated discussions with the First Lien Lenders and the Second Lien Lenders and their respective advisors. To oversee this restructuring process and evaluate and negotiate any proposed transaction, on April 23, 2010, the board of directors of OTC (the "Board") formed a special committee of independent directors unaffiliated with the Debtors' shareholders (the "Special Committee").
11

36. On April 30, 2010, the Debtors provided a written proposal for a standalone restructuring to a steering committee of the First Lien Lenders which reported to hold approximately 50% of the loans outstanding under the First Lien Credit Agreement (the "Steering Committee") and an ad hoc committee of the Second Lien Lenders which reported to hold more than two-thirds of the loans outstanding under the Second Lien Credit Agreement (the "Ad Hoc Committee"). Following the delivery of this proposal, the Debtors and their advisors spent a considerable amount of time discussing the proposal with the Steering Committee and the Ad Hoc Committee and their respective advisors and encouraged them to provide the Debtors with counter-proposals. As a result, each of the Steering Committee and the Ad Hoc Committee proposed its own standalone restructuring plan for the Debtors. Following delivery of these proposals, the Debtors, the Steering Committee and the Ad Hoc Committee continued to negotiate in an effort to reach a consensual standalone restructuring plan. During these negotiations, the Debtors provided the advisors to the Steering Committee and the Ad Hoc Committee with regular access to the Debtors' management and extensive due diligence, including the Debtors' five-year business plan. Notwithstanding the efforts of all parties, as a result of differences in view concerning valuation and other issues, these negotiations failed to produce an agreement on a standalone restructuring plan.

37. Consequently, the Debtors, with assistance from their advisors, initiated a comprehensive review of various strategic alternatives, and solicited input from the Steering Committee and the Ad Hoc Committee. In light of the difference in view among the Debtors' lenders concerning valuation and related matters and the breakdown in negotiations over a standalone restructuring over these issues, the Debtors concluded that a sale process (by testing these competing views concerning valuation against the actual market for the Debtors' assets)

12

was the course of action most likely to create a dynamic with potential to lead to a consensual transaction. In addition, the Debtors were hopeful that a sale process would attract a purchaser or new investor and thereby produce a transaction with a higher value than might be achieved in a standalone restructuring. With support from the Steering Committee and the Ad Hoc Committee, the Debtors promptly initiated a comprehensive two-stage marketing process developed with assistance from Jefferies in an effort to maximize the value of the Debtors for the benefit of all stakeholders.

38. On June 17, 2010, Jefferies began contacting potential third party buyers and preparing a confidential information memorandum to be distributed to interested parties. Over 70 potential bidders, including financial and strategic buyers, were contacted. Thirty-four of these parties executed confidentiality agreements and received the confidential information memorandum and, except in the case of certain strategic buyers that competed with the Debtors, access to an electronic data room. Of these 34 parties, seven submitted preliminary indications of interest on or about July 9, 2010. After careful review of the preliminary indications of interest, the Debtors invited five bidders into the second round during which the bidders were permitted to conduct further due diligence, including access to a comprehensive data room, site visits to the Debtors' offices and distribution centers and participation in management presentations.

39. Ultimately, three parties submitted offers to acquire the Debtors by the August 10, 2010 deadline. All of the offers were below the amount required to pay the Debtors' obligations to the First Lien Lenders in full. In addition, all of the offers contained various contingencies, requiring further business and legal due diligence and the availability of necessary

13

financing. Notably, one of the bids was submitted by an affiliate of the holder of a substantial portion of the Second Lien Lender claims.

40. During the two-month marketing process, the Debtors exhausted the remaining availability under their revolving credit facility with the First Lien Lenders, and the outstanding balance under the revolving credit facility increased from $0 to approximately $13 million. In addition, the Debtors requested and certain First Lien Lenders provided to the Debtors an additional $2.5 million in "LIFO Loans" in the two days preceding the Commencement Date in order to provide sufficient liquidity pending commencement of these chapter 11 cases and obtaining financing under the DIP Facilities. As a result, the Debtors face an immediate liquidity crisis. In addition, August through October is the Debtors' peak period for receiving shipments of goods that will be sold during the holiday shopping season. Absent the availability of additional liquidity, particularly during the next six to eight weeks, the Debtors will not be able to meet their inventory needs and will suffer sales losses during the peak holiday shopping season. Moreover, due in part to news reports concerning the uncertainty of the Debtors' future, some of the Debtors' major vendors have demanded stricter trade terms from the Debtors. As a result, the Debtors have determined that they need immediate access to additional financing in order to maintain their operations and preserve the value of their business.

41. After the August 10 deadline, the Debtors reviewed the results of the marketing process and their liquidity situation with both the Steering Committee and the Ad Hoc Committee. The Steering Committee indicated to the Debtors that while none of the three bids (each of which, as noted above, would require the First Lien Lenders to accept a discount on their claims) were acceptable, they were willing to negotiate a standalone plan between the First Lien Lenders and the Debtors and provide a $40 million debtor in possession financing (the "DIP

14
YCST01:10086137.1                                                                                                    069486.1001

Facilities") to fund the Debtors' continued operations in chapter 11. The Debtors promptly commenced negotiations with the Steering Committee on the terms of the DIP Facilities and a standalone plan.

42. The discussions between the Debtors and the Steering Committee culminated in the execution of a plan support agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Support Agreement"), dated as of August 19, 2010, between the Debtors and certain First Lien Lenders, a copy of which is annexed hereto as Exhibit B. Under the Plan Support Agreement, certain First Lien Lenders agreed to support the proposed restructuring of the Debtors set forth in the plan of reorganization term sheet attached to the Plan Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Term Sheet"). Certain of the First Lien Lenders also agreed to provide the DIP Facilities.

43. The Plan Term Sheet provides that, except to the extent otherwise paid in full in cash, pursuant to a plan of reorganization, the First Lien Lenders will receive in satisfaction of approximately $404 million of their claims (i) new term loans in the aggregate principal amount of $200 million, (ii) 100% of the new common stock of the reorganized Debtors, subject to dilution from a management incentive plan and exercise of warrants described below and (iii) any unpaid adequate protection payments. The Plan Term Sheet also provides for payment in full or on other terms reasonably acceptable to the First Lien Lenders of prepetition claims of vendors that are critical to the Debtors' business. Pursuant to the Plan Term Sheet, each Second Lien Lender will receive its pro rata share of three-year warrants to acquire 2.5% of the new common stock of the reorganized Debtors at a specified enterprise value strike price. Furthermore, the Plan Term Sheet provides that (i) claims arising under section

15

503(b)(9) of the Bankruptcy Code shall be paid in accordance with the Bankruptcy Code and (ii) any other unsecured claims, including potential administrative convenience or "ongoing" trade classes, shall be treated as agreed by the Debtors and the First Lien Lenders.

44. During the negotiation of the Plan Support Agreement and the Plan Term Sheet, the Debtors and the Steering Committee also continued discussions with members of the Ad Hoc Committee. In fact, the Debtors postponed the commencement of these chapter 11 cases by one week in order to explore fully the possibility of an agreement and as described above, certain First Lien Lenders provided $2.5 million of the LIFO Loans to facilitate that effort. Unfortunately, the efforts to reach agreement with the Ad Hoc Committee were unsuccessful.

45. The Debtors decided to proceed with the restructuring plan contemplated by the Plan Term Sheet because it is superior in a number of material respects to the bids submitted in the sale process and the other alternatives currently available to the Debtors. In the Debtors' estimation, the restructuring plan provides the Debtors' creditors with greater aggregate value than these other alternatives. Moreover, because the Plan Support Agreement is not subject to further diligence or financing requirements, the restructuring plan (and the value inherent in it) is less contingent than the bids received in the marketing process. Further, as already noted, certain of the First Lien Lenders have agreed to provide the DIP Facilities. Given the immediacy of the Debtors' financing needs, the liens on the Debtors' pre-petition assets and the resulting inability to prime the First Lien Lenders' liens and the absence of any proposals to provide post-petition financing on a junior basis, the Debtors have determined that the DIP Facilities provide the most advantageous, if not the only available, financing for the Debtors. Finally, the Debtors believe that they need to implement the restructuring contemplated by the Plan Support Agreement promptly since the instability of a protracted and uncertain process

16
YCST01:10086137.1                                                          069486.1001

would erode confidence of the Debtors' employees, customers and vendors in the viability of the Debtors' business and would significantly damage the value of the Debtors' business, to the detriment of all stakeholders.

46. Significantly, the Plan Support Agreement expressly recognizes that the Debtors will retain a "fiduciary out". The Plan Support Agreement provides that the Debtors may terminate the agreement if their board of directors, in the exercise of its fiduciary duties, determines in good faith that a Business Combination (as defined therein, and including a sale of substantially all of the Debtors' assets) is more favorable to the Debtors' estates and creditors and other stakeholders than the restructuring contemplated by the Plan Term Sheet.

47. Consequently, the Debtors commenced these chapter 11 cases to implement restructuring contemplated by the Plan Support Agreement, while at the same time fully retaining the right pursuant to the Plan Support Agreement to continue to explore the potential for a different transaction or plan that the Debtors conclude in the exercise of their fiduciary duties would better maximize the value of their estates and provide greater recoveries to their creditors and other stakeholders.

## PART IV
### First Day Motions and Orders

48. In order to enable the Debtors to operate effectively and minimize the potential adverse effects of the commencement of these chapter 11 cases, concurrently with the filing of their chapter 11 petitions, the Debtors also filed the First Day Motions, a list of which is attached hereto as <u>Exhibit C</u>. The First Day Motions seek relief aimed at, among other things, preserving valuable relationships with suppliers and customers and maintaining employee morale and confidence. Gaining and retaining the support of these key constituencies is critical to the Debtors' efforts to preserve the viability of their business as a going concern.

17
YCST01:10086137.1                                                                                           069486.1001

49. I have reviewed each of the First Day Motions (and the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I believe that the relief sought in each of the First Day Motions (i) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their business or loss of productivity or value, thereby avoiding immediate and irreparable harm to the Debtors' business; (ii) is essential to maintaining the confidence and support of their customers, employees, vendors, suppliers and service providers during the Debtors' bankruptcy process; (iii) establishes procedures for the smooth and efficient administration of these chapter 11 cases; and (iv) is necessary to maximize the value of the Debtors' chapter 11 estates. Therefore, for the reasons stated herein and in each of the First Day Motions, I respectfully request that the Court enter orders approving the First Day Motions.

YCST01:10086137.1    069486.1001

Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 25, 2010

Steven G. Mendlik
Chief Financial Officer and Senior Vice President
  of Finance
Oriental Trading Company, Inc.