## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------   x
                                                               :
In re:                                                         :   Chapter 11
                                                               :
OTC HOLDINGS CORPORATION,                                      :   Case No. 10-_12636_ (___)
et al.,[1]                                                     :
        Debtors.                                               :   Joint Administration Pending
                                                               :
------------------------------------------------------------   x
```

## MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

respectfully represent:

### Jurisdiction

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157

and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before

the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are: OTC Holdings Corporation, a Delaware corporation (0174); Oriental Trading Company, Inc., a Delaware corporation (5603); OTC Investors Corporation, a Delaware corporation (0180); Fun Express, Inc., a Nebraska corporation (7942); and Oriental Trading Marketing, Inc., a Nebraska corporation (0923). The location of the Debtors' corporate headquarters and the service address for all the Debtors is 5455 South 90th Street, Omaha, Nebraska 68127.

## Relief Requested

2.      By this motion (this "Motion"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of the Bankruptcy Code, rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors seek:

(I)      authorization for (a) Oriental Trading Company, Inc. (the "Borrower"), one of the Debtors, to obtain up to $40,000,000 of postpetition financing consisting of up to $33,500,000 of term loans (the "Term Loans") and up to $6,500,000 of revolving loans and letters of credit (such revolving extensions of credit, together with the Term Loans, the "DIP Loans") on the terms and conditions set forth in the Credit and Guarantee Agreement (substantially in the form annexed hereto as Exhibit A, and as hereafter amended, supplemented or otherwise modified from time to time, the "DIP Agreement"; together with all agreements, documents and instruments executed and delivered in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, the "DIP Documents"), among the Borrower, the other Debtors as guarantors (the "Guarantors"), JPMorgan Chase Bank, N.A. ("JPMorgan"), as Administrative Agent (in such capacity, the "DIP Agent") for itself and a syndicate of lenders (collectively, the "DIP Lenders") comprised of certain of the First Lien Lenders (as defined below) and (b) the Guarantors to guaranty on a secured basis the Borrower's obligations in respect of the DIP Loans;

(II)      authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform under the DIP Documents and such

2

other and further acts as may be necessary or appropriate in connection therewith;

(III)    authorization to deem the approximately $1.9 million of outstanding letters of credit (the "Prepetition L/Cs") issued under the First Lien Credit Agreement (as defined below) to have been issued under the DIP Agreement;

(IV)    authorization for the Debtors to use proceeds of the initial borrowing under the DIP Agreement to pay in full the LIFO Obligations (as defined below), including without limitation, $2.5 million aggregate principal amount of first priority term loans (the "LIFO Loans") made on August 23, 2010 by certain of the First Lien Lenders (including the Collateral Agent for such lenders, the "LIFO Lenders") pursuant to the First Lien Credit Agreement in order to address the Debtors' immediate liquidity needs pending obtaining the DIP Loans;

(V)    authorization for the Debtors to (a) use the Cash Collateral (as defined below) pursuant to section 363 of the Bankruptcy Code and all other Prepetition Collateral (as defined below) and (b) provide adequate protection to (i) the lenders (including their affiliates which entered into secured hedge agreements with the Debtors, collectively, the "First Lien Lenders") under the First Lien Credit Agreement, dated as of July 31, 2006, among the Borrower, the First Lien Lenders and JPMorgan, as administrative agent and collateral agent (in such capacity, the "First Lien Agent") for the First Lien Lenders (as amended, supplemented or otherwise modified, the "First Lien Credit Agreement"; and together with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, including without limitation, the Intercreditor Agreement (as defined below), each as amended, supplemented or otherwise modified, the "First Lien

3

Documents") and (ii) the lenders (collectively, the "Second Lien Lenders") under the

Second Lien Credit Agreement, dated as of July 31, 2006, among the Borrower, the

Second Lien Lenders and Wilmington Trust, FSB, as successor to Wachovia Bank,

National Association, as administrative agent and collateral agent (in such capacity,

the "Second Lien Agent") for the Second Lien Lenders (as amended, supplemented or

otherwise modified, the "Second Lien Credit Agreement"; and together with all

security, pledge and guaranty agreements and all other documentation executed in

connection with the foregoing, including without limitation, the Intercreditor

Agreement, each as amended, supplemented or otherwise modified, the "Second Lien

Documents");

   (VI) authorization for the DIP Agent to exercise remedies under the DIP

Documents upon the occurrence and during the continuance of an Event of Default (as

defined in the DIP Agreement);

   (VII) subject to entry of the Final Order (as defined below), authorization to

grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of

action (but not on the actual claims and causes of action) arising under sections 544,

545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance

Actions");

   (VIII) subject to entry of the Final Order, the waiver by the Debtors of any

right to seek to surcharge against the DIP Collateral (as defined below) or the

Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

   (IX) to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the

"Interim Hearing") on this Motion to be held before this Court to consider entry of the

interim order (the "Interim Order"), substantially in the form annexed hereto as

Exhibit B, (a) authorizing the Borrower, on an interim basis, to borrow under the DIP

Agreement up to $2,500,000 of letters of credit and $20,000,000 of the Term Loans to

be used to repay in full the LIFO Obligations (as defined below) and for working

capital and general corporate purposes of the Debtors (including costs related to these

Cases (as defined below)), (b) authorizing the Debtors to use the Cash Collateral and

the other Prepetition Collateral and (c) granting adequate protection to the First Lien

Lenders and the Second Lien Lenders; and

      (X)     to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the

"Final Hearing") for this Court to consider entry of a final order (the "Final Order"),

authorizing and approving on a final basis the relief requested herein, including

without limitation, for the Borrower to borrow the balance of the DIP Loans, for the

Debtors to continue to use the Cash Collateral and the other Prepetition Collateral and

for the Debtors to grant adequate protection to the First Lien Lenders and the Second

Lien Lenders.

### Background

    3.     On the date hereof (the "Petition Date"), each of the Debtors commenced with

the Court a voluntary case (collectively, these "Cases") under chapter 11 of title 11 of the

United States Code (the "Bankruptcy Code"). Each Debtor is authorized to continue to

operate its business and manage its properties as a debtor in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code. As of the Petition Date, no trustee, examiner or

statutory committee has been appointed in these Cases.

4.    The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are more fully set forth in the Declaration of Steven G. Mendlik in Support of Debtors' Chapter 11 Petitions and First Day Relief (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference.

5.    As more fully set forth in the First Day Declaration, the Debtors have commenced these Cases in the midst of a severe liquidity crisis to implement a restructuring negotiated with the First Lien Lenders prior to commencing these Cases, the material terms of which are reflected in a plan support agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Support Agreement") between the Debtors and certain First Lien Lenders. Under the Plan Support Agreement, certain First Lien Lenders agreed to support the proposed restructuring of the Debtors set forth in the plan term sheet attached to the Plan Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Term Sheet").

6.    The Plan Term Sheet provides that, except to the extent otherwise paid in full in cash, pursuant to a plan of reorganization, the First Lien Lenders will receive in satisfaction of approximately $404 million of their claims (i) new term loans in the aggregate principal amount of $200 million, (ii) 100% of the new common stock of the reorganized Debtors, subject to dilution from a management incentive plan and exercise of warrants described below and (iii) any unpaid adequate protection payments. The Plan Term Sheet also provides for payment in full or on other terms reasonably acceptable to the First Lien Lenders of prepetition claims of vendors that are critical to the Debtors' business. Pursuant to the Plan Term Sheet, each Second Lien Lender will receive its pro rata share of three-year warrants to acquire 2.5% of the new common stock of the reorganized Debtors at a specified enterprise

6

value strike price. Furthermore, the Plan Term Sheet provides that (i) claims arising under section 503(b)(9) of the Bankruptcy Code shall be paid in accordance with the Bankruptcy Code and (ii) any other unsecured claims, including potential administrative convenience or "ongoing" trade classes, shall be treated as agreed by the Debtors and the First Lien Lenders.

7.      The Debtors determined, in the exercise of their fiduciary duties, that the restructuring contemplated by the Plan Support Agreement maximizes the value of the Debtors' estates for the benefit of stakeholders. Nevertheless, pursuant to the Plan Support Agreement, the Debtors maintain the right to implement an alternative restructuring if, in the exercise of their fiduciary duties, the Debtors determine that such alternative restructuring is more favorable to the Debtors' estates, creditors and other stakeholders than the restructuring contemplated by the Plan Support Agreement.

8.      The Debtors determined that entry into the Plan Support Agreement and the commencement of these Cases were essential to maximizing the value of the estates. Without immediate access to postpetition financing, the Debtors cannot be assured of their ability to continue to fund their day-to-day operations. The Debtors require postpetition financing to preserve their going-concern value in order to maximize the value of their estates.

9.      To that end, the Debtors are seeking authorization to obtain postpetition financing facilities (the "DIP Facilities") in an aggregate amount not to exceed $40 million consisting of a $33.5 million term loan facility and a $6.5 million revolving credit facility. The Debtors are seeking access to up to $22.5 million of the DIP Facilities on an interim basis. The Debtors require immediate access to the DIP Facilities because August through October is the Debtors' peak period for receiving shipments of goods that will be sold during the holiday shopping season and, absent the availability of the DIP Facilities during the next

7

six to eight weeks, the Debtors will not be able to meet inventory needs and will suffer sales losses during the peak holiday shopping season.

### The Debtors' Prepetition Capital Structure

10.     As set forth in the First Day Declaration, as of the Petition Date, the Debtors had substantial outstanding indebtedness under three loan agreements, as described below:

*First Lien Credit Agreement*

11.     Pursuant to the First Lien Credit Agreement, the First Lien Lenders agreed to provide the Borrower with a seven-year term loan facility in the original aggregate principal amount of $410 million and a six-year revolving credit facility in the original aggregate amount of $50 million (including a $20 million letter of credit sub-facility), which revolving credit commitment was reduced to $15 million (including the letter of credit sub-facility) on March 25, 2010. The obligations of the Borrower under the First Lien Credit Agreement are guaranteed by OTC Investors Corporation ("Holdings"), Fun Express, Inc. ("Fun Express") and Oriental Trading Marketing, Inc. ("Marketing").

12.     In the five (5) weeks leading up to the Petition Date, the revolving credit facility became fully drawn as the amount of loans borrowed thereunder increased from $0 to approximately $13 million. Moreover, on August 23, 2010, just two days before the Petition Date, the Debtors requested, and the LIFO Lenders made, the LIFO Loans in order to address the Debtors' immediate liquidity needs pending obtaining the DIP Loans. As of the Petition Date, the Debtors are liable to the LIFO Lenders in the aggregate principal amount of $2.5 million in respect of the LIFO Loans, plus accrued and unpaid interest thereon and fees and expenses (including fees and expenses of attorneys) as provided in the First Lien Documents (collectively, the "LIFO Obligations"). The LIFO Obligations are secured by the first priority

8

(subject to permitted exceptions under the First Lien Credit Agreement) liens on and security interests in the Prepetition Collateral (as defined below) to the extent set forth in the First Lien Documents in respect of the LIFO Obligations.

13. As of the Petition Date, the aggregate principal amount outstanding under the term loan facility of the First Lien Credit Agreement (other than the LIFO Loans) is $383.6 million. Additionally, as of the Petition Date, approximately $13 million of revolving loans and approximately $1.9 million of letters of credit are outstanding under the First Lien Credit Agreement. In addition, the Borrower is party to interest rate swap agreements entered into in connection with the First Lien Credit Agreement, under which the Borrower would be obligated for a termination amount of approximately $5.1 million if such agreements had been terminated as of the Petition Date. Accordingly, the aggregate principal amount outstanding under the First Lien Credit Agreement and related documents is approximately $403.6 million in respect of loans made (other than the LIFO Obligations), letters of credit issued and interest rate hedges provided, by the First Lien Lenders plus accrued and unpaid interest, consent and other fees, costs and expenses (including fees and expenses of attorneys and advisors) as set forth in the First Lien Documents (collectively, the "First Lien Obligations").

14. The First Lien Obligations are secured pursuant to the First Lien Documents by first priority (subject to permitted exceptions under the First Lien Credit Agreement) security interests and liens granted by the Debtors to the First Lien Agent (for the ratable benefit of the First Lien Lenders) in and upon the personal and real property of the Debtors constituting "Collateral" under, and as defined in, the First Lien Credit Agreement (together with the Cash Collateral, the "Prepetition Collateral").

### Second Lien Credit Agreement

15.     Pursuant to the Second Lien Credit Agreement, the Second Lien Lenders provided the Borrower with a seven-and-a-half-year term loan facility in the aggregate principal amount of $180 million.  The obligations of the Borrower under the Second Lien Agreement are guaranteed by Holdings, Fun Express and Marketing.

16.     As of the Petition Date, $180 million in principal amount and approximately $6 million in accrued and unpaid interest are outstanding under the Second Lien Credit Agreement (such amount, plus accrued and unpaid fees and expenses (including fees and expenses of attorneys and advisors) as provided in the Second Lien Documents are collectively referred to as, the "Second Lien Obligations").

17.     The Second Lien Obligations are secured pursuant to the Second Lien Documents by second priority (subject to permitted exceptions under the Second Lien Credit Agreement) security interests in and liens on the Prepetition Collateral granted by the Debtors to the Second Lien Agent (for the ratable benefit of the Second Lien Lenders).

### Intercreditor Agreement

18.     The First Lien Agent and the Second Lien Agent entered into that certain Intercreditor Agreement, dated as of July 31, 2006, a copy of which is annexed hereto as Exhibit C (as amended, supplemented or otherwise modified, the "Intercreditor Agreement"), by and among JPMorgan, as collateral agent for the First Priority Secured Parties (as defined in the Intercreditor Agreement), Wilmington Trust, FSB, as successor collateral agent for the Second Priority Secured Parties (as defined in the Intercreditor Agreement), the Borrower and certain other Debtors, to set forth the relative lien priorities and other rights and remedies of the First Lien Lenders and the Second Lien Lenders with respect to, among other things, the

10

Prepetition Collateral. Pursuant and subject to Sections 5.2 and 5.4 of the Intercreditor Agreement, the Second Lien Agent and the Second Lien Lenders have agreed that, prior to the indefeasible payment in full in cash of all amounts owing to the First Lien Lenders, they (i) will be deemed to have consented to, will raise no objection to, nor support any other person objecting to the use of Cash Collateral or to the DIP Facilities; (ii) will not request or accept adequate protection or any other relief in connection with the use of the Cash Collateral or the DIP Facilities except for the adequate protection contemplated herein; (iii) will not object to, contest, or support any other person objecting to or contesting, any request by the First Lien Lenders for adequate protection or any adequate protection provided to the First Lien Lenders; and (iv) will subordinate (and will be deemed to have subordinated) their liens on the Prepetition Collateral to the DIP Liens (as defined below) and Adequate Protection Liens (as defined below) as contemplated herein.[2]

*Mezzanine Loan Agreement*

19.    Pursuant to the Mezzanine Loan Agreement, dated as of July 31, 2006 (as amended, supplemented or otherwise modified, the "Mezzanine Loan Agreement"), by and among Holdings, Wilmington Trust, FSB (as successor agent to Wachovia Bank, National

---

[2]    Pursuant to Section 5.2 of the Intercreditor Agreement, the Second Lien Agent and the Second Lien Lenders retained a limited right to object to (x) any ancillary agreements or arrangements regarding the cash collateral use or debtor in possession financing that are materially and disproportionately prejudicial to their interests as compared to the First Lien Lenders, (y) any debtor in possession financing **to the extent that** (i) it compels the Debtors to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the debtor in possession financing documentation or a related document or (ii) the aggregate principal amount of loan and letter of credit accommodations outstanding or available under such debtor in possession financing exceeds an amount equal to $50,000,000 and (z) the debtor in possession financing documentation or cash collateral order to the extent that it expressly requires the liquidation of the Common Collateral (as defined in the Intercreditor Agreement) prior to a default under such debtor in possession financing documentation or cash collateral order.

11

Association), as administrative agent, and the lenders from time to time party thereto (the "Mezzanine Lenders"), the Mezzanine Lenders provided the Debtors with an eight-and-a-half-year term loan facility in the original aggregate principal amount of $70 million. Holdings is a holding company whose only asset is the stock of the Borrower and the obligations of Holdings under the Mezzanine Loan Agreement are not secured or guaranteed by any other Debtor.

20.     As of the Petition Date, the aggregate principal amount outstanding under the Mezzanine Loan Agreement is approximately $120 million.

### The Debtors' Efforts to Obtain Postpetition Financing

21.     Prior to the commencement of these Cases, the Debtors' financial advisors approached the First Lien Lenders to obtain debtor in possession financing. In connection with the negotiations regarding such financing, the First Lien Lenders indicated that they would not consent to having their liens primed by a third party lender. The Debtors determined that the DIP Facilities proposed by certain First Lien Lenders were the best available to the Debtors under the circumstances since any alternative facility would require the priming of the liens granted for the benefit of the First Lien Lenders, which would be contested and, as a result, uncertain, time consuming and costly. Moreover, as more fully set forth in the First Day Declaration, the bids the Debtors received for substantially all of their assets in connection with the marketing process that was conducted prepetition were not sufficient to satisfy the First Lien Obligations in full. Therefore, the Debtors determined that it would be difficult to provide adequate protection to the First Lien Lenders if their liens are primed without their consent. Further, given the size of the claims of the First Lien Lenders and the Second Lien Lenders in relation to the range of value for the Debtors' assets as

demonstrated by the Debtors' sale process, the Debtors determined that soliciting proposals from third party lenders on a junior lien basis would be futile.

22. The terms of the DIP Facilities are the product of good-faith, extensive, arms-length negotiations, which culminated in the DIP Agreement. During the negotiation process, the proposed DIP Lenders made several key concessions. For example, the DIP Lenders reduced the DIP Facilities' proposed pricing 100 basis points from LIBOR plus 675 basis points to LIBOR plus 575 basis points, lowered the LIBOR floor from 3% to 2% and modified certain affirmative and negative covenants. The pricing that the Debtors would have obtained on a junior lien basis from other third party lenders, even if available, would have been much higher than the pricing of the DIP Facilities.

23. Given the immediacy of the Debtors' financing needs, the liens on the Debtors' prepetition assets and the resulting inability to prime the First Lien Lenders' liens and the absence of any proposals to provide post-petition financing on a junior basis, the Debtors have determined that the DIP Facilities provide the most advantageous, if not the only available, financing for the Debtors. Moreover, JPMorgan, the proposed DIP Agent under the DIP Facilities, as the administrative agent and one of the lenders under the Debtors' First Lien Credit Agreement, has a substantial base of knowledge with respect to the Debtors' business, their capital structure and the prepetition collateral, all of which would enable JPMorgan, as the DIP Agent, to act with the speed necessitated by the Debtors' liquidity requirements.

24. Finally, the terms of the Intercreditor Agreement facilitate the approval of the DIP Facilities and the other relief sought herein under sections 363 and 364 of the Bankruptcy Code. The DIP Facilities and the use of the Cash Collateral have been structured to be consistent with the Intercreditor Agreement. Accordingly, pursuant and subject to the

13

Intercreditor Agreement, upon the First Lien Lenders' consent to the DIP Facilities and the use of the Cash Collateral, the Second Lien Lenders are deemed to have consented to the DIP Facilities and the use of the Cash Collateral.

### Need for Debtor in Possession Financing and Use of Prepetition Collateral

25.    If this Motion is not approved and the Debtors do not obtain authorization to borrow under the DIP Facilities and to use the Prepetition Collateral, including the Cash Collateral, the Debtors will suffer immediate and irreparable harm.  Without the funds available under the DIP Facilities and the use of the Cash Collateral, the Debtors will not have the liquidity to conduct their business as a going concern.  The Debtors do not have and have not had, access to their prepetition credit facilities since the commencement of these Cases.  The Debtors have no unencumbered cash.  The Debtors urgently need funds to make payroll, vendor payments and other expenditures that are critical to their continued viability and ability to reorganize their capital structure.

26.    Moreover, although the use of the Cash Collateral is necessary to the operation of the Debtors' businesses, the use of the Cash Collateral alone is insufficient to relieve the Debtors' liquidity constraints.  Therefore, the Debtors have an immediate need for additional liquidity, which could only be obtained through the DIP Facilities.  Other than through the DIP Facilities, the Debtors cannot obtain financing (secured or otherwise) to continue their day-to-day operations.

14

## Summary of the Terms of the DIP Facilities[3]

| | |
|---|---|
| Borrower: | Oriental Trading Company, Inc. *(Interim Order: Introductory paragraph; DIP Agreement: Introductory paragraph)* |
| Guarantors: | OTC Holdings Corporation, a Delaware corporation and holding company parent of Holdings ("Parent"), Holdings and each of the Borrower's direct and indirect, existing and future subsidiaries (collectively, the "Guarantors"). *(Interim Order: (l); DIP Agreement: Introductory paragraph)* |
| Sole Lead Arranger and Sole Bookrunner: | J.P. Morgan Securities Inc. (the "Arranger"). *(DIP Agreement:§ 1.1, "Lead Arranger")* |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank" and, in such capacity, the "DIP Agent"). *(Interim Order: (l); DIP Agreement: Introductory paragraph)* |
| DIP Lenders: | Certain of the lenders under the First Lien Credit Agreement. *(Interim Order: (l); DIP Agreement: Introductory paragraph)* |

**Term Facility**

| | |
|---|---|
| Type and Amount: | A six-month term loan facility (the "Term Facility"; the commitments thereunder the "Term Commitments") in the amount of $33,500,000 (the loans thereunder, the "Term Loans"). The Term Loans shall be repaid on the date (such date, the "Termination Date") of the earliest to occur of: (x) 40 days after entry of the Interim Order (as defined below) if the Final Order (as defined below) has not been entered prior to such date, (y) the consummation of a Plan of Reorganization and (z) the six-month anniversary of the Closing Date referred to below (the "Maturity Date"). *(Interim Order: (l); DIP Agreement:§§ 2.1, 2.3)* |
| Availability: | The Term Loans shall be made in up to two drawings, during the period commencing on the Closing Date and ending on the fifth Business Day after entry of the Final Order (as defined below). The proceeds of the Term Loans in excess of the amounts satisfying clause (d) of "On-Going Conditions" shall be deposited into an account in the sole dominion and control of the Administrative Agent (the "Term Loan Account") and shall be released to the Borrower upon satisfaction of the applicable "On-Going Conditions" below. Amounts on deposit in the Term Loan Account on the Maturity Date shall be applied on such |

---

[3]     The terms and conditions of the DIP Agreement set forth in this Motion are intended solely for informational purposes to provide the Court and interested parties with a brief overview of the significant terms thereof and should only be relied upon as such. For a complete description of the terms and conditions in the DIP Agreement, reference should be made to the DIP Agreement and the Interim Order. The summary herein is qualified in its entirety by reference to such documents. In the event that there is a conflict or inconsistency between this Motion and the DIP Documents, the DIP Documents shall control in all respects. Unless otherwise defined herein, capitalized terms used in this summary shall have the meanings ascribed to them in the Interim Order or the DIP Agreement, as applicable.

date to reduce the outstanding amount of the Term Loans. *(DIP Agreement:§ 2.1)*

| | |
|---|---|
| Purpose: | The proceeds of the Term Loans shall be used (i) to repay in full the LIFO Obligations and (ii) to finance the working capital needs and general corporate purposes of the Debtors (including costs related to these Cases) in accordance with the Budget (as defined in, and including any permitted variance and amendment thereof pursuant to, the DIP Agreement). *(Interim Order: ¶¶ 6, 22; DIP Agreement:§ 6.8)* |

**Revolving Facility**

| | |
|---|---|
| Type and Amount: | A six-month revolving facility (the "Revolving Facility"; the commitments thereunder, the "Revolving Commitments") in the amount of $6,500,000 (the loans thereunder, the "Revolving Loans"). *(Interim Order: (I); DIP Agreement: § 2.4)* |
| Availability: | The Revolving Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the Termination Date. The Revolving Loans shall be repaid on the Termination Date. *(DIP Agreement: § 2.4)* |
| Letters of Credit: | A portion of the Revolving Facility not in excess of $5,000,000 shall be available for the issuance of letters of credit (the "Letters of Credit") by JPMorgan Chase Bank (in such capacity, the "Issuing Lender"). No Letter of Credit issued after the Closing Date shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) five business days prior to the Maturity Date, unless the Issuing Lender shall have agreed otherwise in its sole discretion and upon such terms and conditions satisfactory to the Issuing Lender. All issued and outstanding letters of credit under the First Lien Credit Agreement on the Closing Date (the "Prepetition Letters of Credit") shall be deemed to be Letters of Credit issued under the Revolving Facility. *(Interim Order: ¶ 5; DIP Agreement: § 3.1)* |
| | Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Loans) on the same business day (or on the next business day if notice of such drawing is received after 10:00 a.m.). To the extent that the Borrower does not so reimburse the Issuing Lender, (i) first, the Administrative Agent shall apply any funds in the Term Loan Account to reimburse the Issuing Lender and (ii) second, the DIP Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to fund participations in any such reimbursement obligation on a pro rata basis. *(DIP Agreement: §§ 3.4, 3.5)* |
| Purpose: | The proceeds of the Revolving Loans shall be used to finance the working capital needs and general corporate purposes of the Debtors (including costs related to these Cases) in accordance with the Budget. *(Interim Order: ¶¶ 6, 22; DIP Agreement: § 6.8)* |
| Interest Rate Options: | The Borrower may elect that the DIP Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the |

16

Applicable Margin or (b) the Eurodollar Rate plus the Applicable Margin. *(DIP Agreement: § 2.15)*

As used herein:

"ABR" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus 0.5%, (iii) the Eurodollar Rate (as defined below) for a one-month interest period, plus 1% and (iv) 3.0%.

"Applicable Margin" means (i) 4.75% in the case of ABR Loans and (ii) 5.75% in the case of Eurodollar Loans.

"Eurodollar Rate" means the greater of (i) rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two or three months (as selected by the Borrower) appearing on Reuters Screen LIBOR01 Page and (ii) 2.0%.

| | |
|---|---|
| Interest Payment Dates: | In the case of DIP Loans bearing interest based upon the ABR ("ABR Loans"), monthly in arrears. |
| | In the case of DIP Loans bearing interest based upon the Eurodollar Rate ("Eurodollar Loans"), on the last day of each relevant interest period and, in the case of any interest period longer than one month, on each successive date one month after the first day of such interest period. *(DIP Agreement: § 2.15)* |
| DIP Facilities Fees: | The Debtors agreed to pay various commitment, underwriting, arranger and administrative agency fees to the DIP Agent, the Arranger and the DIP Lenders, in the aggregate amount of approximately 4% of the aggregate amount of the commitments available under the DIP Facilities. *(DIP Agreement: § 2.9)* |
| Unused Availability Fees: | The Borrower shall pay a fee calculated at a rate per annum equal to 0.75% on the average daily unused portion of the DIP Facilities, payable monthly in arrears. *(DIP Agreement: § 2.9)* |
| Letter of Credit Fees: | The Borrower shall pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans on the face amount of each such Letter of Credit. Such fee shall be shared ratably among the DIP Lenders participating in the Revolving Facility and shall be payable monthly in arrears. |
| | A fronting fee equal to 0.125% per annum on the face amount of each Letter of Credit shall be payable monthly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account. *(DIP Agreement: § 3.3)* |
| Default Rate: | At any time after the occurrence and during the continuance of an Event of Default, all outstanding DIP Loans shall bear interest at 2% above |

the rate otherwise applicable thereto and all other obligations shall bear interest at 2% above the rate applicable to the relevant ABR Loans. *(DIP Agreement: § 2.15)*

| | |
|---|---|
| Optional Prepayments and Commitment Reductions: | DIP Loans may be prepaid and commitments may be reduced at any time without premium or penalty by the Borrower, provided that, at any time while Term Commitments are in effect, all such reductions shall be made ratably between the Revolving Commitments and the Term Commitments. Optional prepayments of the Term Loans may not be reborrowed. *(DIP Agreement: §§ 2.11, 2.18)* |
| Mandatory Prepayments and Reduction of Commitments: | 100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) by any of the Loan Parties of any assets, except for the sale of inventory or obsolete or worn-out property in the ordinary course of business and subject to certain other customary exceptions (including capacity for reinvestment) shall be applied ratably to reduce permanently the Term Commitments (or if no Term Commitments are in effect, to prepay the Term Loans) and to reduce permanently the Revolving Commitments and/or cash collateralize outstanding Letters of Credit, provided that the Revolving Commitments shall not be reduced with such net proceeds to an amount below $5,000,000. |

Mandatory prepayments of the Term Loans may not be reborrowed. The Revolving Loans shall be prepaid and the Letters of Credit shall be cash collateralized or replaced to the extent such extensions of credit exceed the amount of the Revolving Commitments.

On a weekly basis, unrestricted cash and cash equivalents in excess of the sum of $2,500,000 plus the aggregate amount of checks which have been written but not yet cleared as of such date shall be applied, first, to prepay outstanding Revolving Loans and, second, as a deposit to the Term Loan Account, provided that amounts on deposit in the Term Loan Account shall not exceed the outstanding principal amount of the Term Loans. *(DIP Agreement: § 2.12)*

| | |
|---|---|
| Priority and Liens: | Except to the extent expressly set forth in the Interim Order in respect of the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations (as defined below) shall constitute allowed senior administrative expense claims against the Debtors with priority over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. |

As security for all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Documents, the Interim Order and the DIP Loans (collectively, the "<u>DIP Obligations</u>"), effective and perfected upon the date of the Interim Order and without the necessity

of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests and liens shall be granted by the Debtors to the DIP Agent, for itself and the benefit of the DIP Lenders (all property of the Debtors identified in clauses (a), (b) and (c) below being collectively referred to as the "DIP Collateral"), subject and subordinate only to the Carve-Out (all such liens and security interests granted to the DIP Agent pursuant to the Interim Order, the "DIP Liens"):

(a) First Lien on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to either (i) valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date, or (ii) a valid lien perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"); provided, that the Unencumbered Property shall not include the Avoidance Actions, but subject to entry of the Final Order, Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions;

(b) Liens Junior to Certain Existing Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Debtors (other than the property described in paragraph (c) below, as to which the DIP Liens will have the priority as described in such clause), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Non-Primed Liens"), which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to the Non-Primed Liens;

(c) Liens Priming First Lien Lenders' and Second Lien Lenders' Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral (whether now existing or hereafter acquired). The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of (i) the First Lien Agent and the First Lien Lenders (including, without limitation, the First Lien Adequate Protection Liens) and (ii) the Second Lien Agent and the Second Lien Lenders (including, without limitation, the Second Lien Adequate Protection Liens (as defined below), but shall be junior to any Non-Primed Liens on the Prepetition Collateral; and

19

subject in each case to, in the event of the occurrence and during the continuance of a Carve-Out Event (as defined below), a carve-out for (a) any fees payable to the Clerk of the Bankruptcy Court and to the Office of the United States trustee pursuant to 28 U.S.C. § 1930(a) and (b) up to $1,000,000 of allowed fees, expenses and disbursements (regardless of when such fees, expenses and disbursements become allowed by order of the Court) of professionals retained by order of the Court, incurred after the occurrence of a Carve-Out Event plus all unpaid professional fees, expenses and disbursements allowed by the Court that were incurred in compliance with the Budget prior to the occurrence of a Carve-Out Event (regardless of when such fees, expenses and disbursements become allowed by order of the Court). For the purposes hereof, a "Carve-Out Event" shall occur upon the occurrence and during the continuance of an Event of Default under the DIP Agreement or a material breach by the Debtors of the Interim Order and, in each case, upon delivery of a written notice thereof by the DIP Agent or the Required Lenders (as defined in the DIP Agreement) to the Debtors (a "Carve-Out Notice"). So long as no Carve-Out Event shall have occurred and be continuing, the Carve-Out shall not be reduced by the payment of fees, expenses and disbursements of professionals retained by order of the Court allowed by the Court and payable under Sections 328, 330 and 331 of the Bankruptcy Code, which allowed fees, expenses and disbursements shall be paid in accordance with the Budget, and the Carve-Out shall not be reduced by the application of any pre-petition retainers by any such professionals. Upon the delivery of a Carve-Out Notice, the right of the Debtors to pay professional fees incurred under clause (b) above without reduction of the Carve-Out in clause (b) above shall terminate and upon receipt of such notice, the Debtors shall provide immediate notice by facsimile and email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtors' ability to pay professionals is subject to the Carve-Out; provided that the Carve-Out shall not be available to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the LIFO Lenders, the First Lien Lenders, the First Lien Agent, the Second Lien Lenders or the Second Lien Agent. *(Interim Order: ¶¶ 7, 8; DIP Agreement: § 2.24)*

| | |
|---|---|
| Use of Cash Collateral | The First Lien Lenders have consented to the Debtors' use of the Prepetition Collateral, including the Cash Collateral, during the period from the Petition Date through and including the Termination Date for working capital and general corporate purposes (including costs related to these Cases) in accordance with the Budget, provided that the First Lien Lenders and the Second Lien Lenders are granted adequate protection as set forth below. By virtue of the First Lien Lenders' consent to the Debtors' use of Cash Collateral as set forth herein and in the Interim Order, pursuant and subject to the Intercreditor Agreement, the Second Lien Lenders will be deemed to have consented to such use of the Cash Collateral. *(Interim Order: ¶¶ 4, 15)* |
| Adequate Protection: | The First Lien Agent and the First Lien Lenders shall be entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral (including substantially all of the Debtors' cash, |

20

including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any First Lien Lender and any cash proceeds of the disposition of any Prepetition Collateral (the "Cash Collateral")), in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the First Lien Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "First Lien Adequate Protection Obligations"). As adequate protection, the First Lien Agent and the First Lien Lenders shall be granted the following:

(a) <u>First Lien Adequate Protection Liens</u>. As security for the payment of the First Lien Adequate Protection Obligations, the First Lien Agent (for itself and for the benefit of the First Lien Lenders) shall be granted a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "First Lien Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out and (iii) the Non-Primed Liens.

(b) <u>First Lien Section 507(b) Claims</u>. The First Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "First Lien 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations. Except to the extent expressly set forth in the Interim Order, the First Lien Agent and the First Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the First Lien 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash. Notwithstanding their status as First Lien 507(b) Claims, the First Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in these Cases in the manner set forth in such plan if holders of more than 66% (by amount) of the First Lien Adequate Protection Obligations consent to such treatment.

(c) <u>Interest, Fees and Expenses</u>. The Debtors shall be authorized and directed to (a) immediately pay as adequate protection to the First Lien Agent an amount equal to all accrued and unpaid interest on the loans constituting the First Lien Obligations at the non-default LIBOR rate under the First Lien Credit Agreement, all regularly scheduled payments under any hedge agreements, all accrued and unpaid letter of credit fees and all other accrued and unpaid fees and disbursements owing to the First Lien Agent under the First Lien Documents and accrued prior to the Petition Date and (b) on the last business day of each calendar month after the entry of this Order, pay as adequate protection an amount equal to all accrued and unpaid interest on the loans constituting the First Lien Obligations at the applicable non-default LIBOR rate set forth in the First Lien Documents (which

21

payments and pricing shall be without prejudice to the rights of the First Lien Agent and any First Lien Lenders to assert a claim for the payment of additional interest calculated at any other rates applicable pursuant to the First Lien Credit Agreement, and without prejudice to the rights of the Debtors or other party in interest to contest any such additional claims), all regularly scheduled payments under any hedge agreements , in each case subject to Section 506(b) of the Bankruptcy Code. As additional adequate protection, the Debtors shall also pay to the First Lien Agent all reasonable fees and expenses payable to the First Lien Agent under the First Lien Documents, including without limitation, the reasonable fees and disbursements of counsel and financial advisors to the First Lien Agent and the reasonable expense of members of the steering committee of the First Lien Lenders (including, without limitation, the reasonable fees and expenses of counsel). The Debtors shall pay these fees and expenses promptly after receipt of invoices therefor, and the Debtors shall promptly provide copies of such invoices to the counsel to the Committee and to the U.S. Trustee.

(d) Credit Bidding. As additional adequate protection, the First Lien Agent (on behalf of the First Lien Lenders) shall, acting at the direction of the Required Lenders (as defined in the First Lien Credit Agreement, the "Required First Lien Lenders") have the right to "credit bid" the amount of the First Lien Obligations in connection with any sale of the Prepetition Collateral, including without limitation, any sale pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129(b) of the Bankruptcy Code. *(Interim Order: ¶ 16; DIP Agreement: § 2.24)*

The Second Lien Agent and the Second Lien Lenders shall be afforded, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of their interests in the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Second Lien Agent's liens on the Prepetition Collateral by the DIP Liens and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Second Lien Adequate Protection Obligations", together with the First Lien Adequate Protection Obligations, the "Adequate Protection Obligations"). As adequate protection, the Second Lien Agent and the Second Lien Lenders shall be granted the following:

(a) Second Lien Adequate Protection Liens. As security for the payment of the Second Lien Adequate Protection Obligations, the Second Lien Agent (for itself and for the benefit of the Second Lien Lenders) shall be granted a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Second Lien Adequate Protection Liens", together with the First Lien Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the First Lien Adequate Protection Liens, (iv) the liens securing the First Lien

22

Obligations and (v) the Non-Primed Liens.

(b) Second Lien 507(b) Claims. The Second Lien Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "Second Lien 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims granted in respect of the DIP Obligations and (iii) the First Lien 507(b) Claims. The Second Lien Agent and the Second Lien Lenders shall not receive or retain any payments, property or other amounts in respect of the Second Lien 507(b) Claims unless and until all DIP Obligations, the First Lien Adequate Protection Obligations and the First Lien Obligations shall have indefeasibly been paid in full in cash. In addition to, and notwithstanding anything to the contrary contained in the Interim Order, any Second Lien Adequate Protection Obligations may be satisfied in a plan of reorganization confirmed in these Cases in the manner set forth in the Intercreditor Agreement. *(Interim Order: ¶ 18)*

**Initial Conditions:**

The availability of the DIP Facilities are conditioned upon the satisfaction of conditions precedent usual for facilities and transactions of this type, including, without limitation, the following conditions (the date upon which all such conditions precedent shall be satisfied, the "Closing Date"):

(a) Each Loan Party shall have executed and delivered satisfactory definitive financing documentation with respect to the DIP Facilities (the "DIP Documentation").

(b) The interim order approving the DIP Facilities and providing for the use of the prepetition lenders' cash collateral shall provide that until entry of the Final Order (i) extensions of credit under the Revolving Facility shall not exceed $2,500,000, consisting solely of letters of credit (inclusive of the Prepetition Letters of Credit) and (ii) loans under the Term Facility shall not exceed $20,000,000 and shall otherwise be in form and substance satisfactory to the Required Lenders (the "Interim Order"), shall have been entered by the Court, shall be in full force and effect and shall not be subject to any stay.

(c) The DIP Agent shall have received (i) a monthly budget for the six months following the Petition Date and (ii) an initial thirteen-week cash flow forecast for the period beginning with the week which includes the Petition Date through the thirteenth week thereafter (the "Budget"), in each case in form and substance satisfactory to the Required Lenders.

(d) The DIP Lenders, the DIP Agent and the Arranger shall have received all fees required to be paid, and all expenses required to be paid for which invoices have been presented, on or before the Closing Date.

(e) All governmental and third party approvals necessary in connection with the financing contemplated hereby and the continuing operations

23

of the Borrower and its subsidiaries (including shareholder approvals, if any) shall have been obtained on satisfactory terms and shall be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the DIP Facilities or, any of the transactions contemplated by the Restructuring.

(f) The DIP Agent shall have received the results of a recent lien search in each relevant jurisdiction with respect to the Debtors, and such search shall reveal no liens on any of the assets of the Debtors except for liens permitted by the DIP Documentation.

(g) All documents and instruments required to perfect the DIP Agent's first priority security interest in the collateral under the DIP Facilities (including delivery of stock certificates and undated stock powers executed in blank) shall have been executed and be in proper form for filing.

(h) All motions and orders submitted to the Court on or about the Petition Date shall be in form and substance reasonably satisfactory to the Required Lenders.

(i) The Required Lenders shall be reasonably satisfied with the cash management arrangements of Holdings and its subsidiaries.

(j) The DIP Agent shall have received such legal opinions (including opinion from counsel to the Debtors), documents and other instruments as are customary for transactions of this type or as they may reasonably request.

(k) The Administrative Agent shall have received satisfactory evidence that the LIFO Loans under the First Lien Credit Agreement shall have been paid in full and that the liens in respect thereof have been released. *(DIP Agreement: § 5.1)*

On-Going Conditions:    The making of each extension of credit and each release of proceeds of the Term Loans from the Term Loan Account shall be conditioned upon (a) except with respect to the initial extension of credit and a release of proceeds thereof from the Term Loan Account, the final order approving the DIP Facilities, substantially in the form of the Interim Order and otherwise in form and substance satisfactory to the Required Lenders (the "Final Order"), having been entered by the Court, being in full force and effect and not being subject to any stay, (b) the accuracy in all material respects of all representations and warranties in the DIP Documentation, (c) there being no default or event of default in existence at the time of, or after giving effect to the making of, such extension of credit, (d) the proceeds of such extension of credit or released from the Term Loan Account, when added to the aggregate amount of unrestricted cash on hand of the Loan Parties in excess of $2,500,000, is required to make expenditures in accordance with the Budget within seven days after the making of such extension of credit or release of proceeds, as applicable and (e) in the case of a borrowing of Revolving Loans, there shall be no amounts in the Term Loan

24

Account other than such amounts which are being requested to be released concurrently with such borrowing. *(DIP Agreement: § 5.2)*

| | |
|---|---|
| Financial Covenants: | To include (i) a cumulative variance test for each of operating receipts and disbursements against the Budget, to be tested weekly, and (ii) a minimum EBITDA covenant to be tested monthly. *(DIP Agreement: § 7.1)* |
| Events of Default: | Among other things, nonpayment of principal when due; nonpayment of interest, fees or other amounts after a one business day grace period; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of certain affirmative covenants, to a five day grace period); cross-default to material postpetition indebtedness; certain ERISA events; material judgments; actual or asserted invalidity of any liens or superpriority claims granted to secured obligations under the DIP guarantee or security document; milestones relating to these Cases, or failure (i) to file with the Court the Plan of Reorganization and related Disclosure Statement within 30 days after the Petition Date, (ii) to obtain an order approving such Disclosure Statement within 75 days after the Petition Date, (iii) to obtain an order of the Court confirming the Plan of Reorganization within 125 days after the Petition Date and (iv) to consummate the Plan of Reorganization within 135 days after the Petition Date; Debtors' request for or entry of (x) any modification of the Interim Order without the prior written consent of the DIP Agent (acting with the consent of the Required Lenders) and the First Lien Agent (acting with the consent of the Required First Lien Lenders), as applicable (no such consent to be implied by any other action, inaction or acquiescence by the DIP Agent or the First Lien Agent) or (y) an order converting or dismissing any of the Cases; and customary bankruptcy-related defaults. *(Interim Order: ¶ 20; DIP Agreement: § 8)* |
| Remedies After Event of Default: | The automatic stay under section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Agent and the Required Lenders to exercise, (a) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the DIP Documents, other than those rights and remedies against the DIP Collateral as provided in clause (b) below, and (b) upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtors (with a copy to counsel to the Debtors, counsel to the Committee and the U.S. Trustee), all rights and remedies against the DIP Collateral provided for in the DIP Documents and the Interim Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender). In any hearing regarding any such exercise of rights or remedies, the only issue to be determined shall be whether, in fact, an Event of Default has occurred and is continuing. *(Interim Order ¶ 9; DIP Agreement: § 8)* |
| Expenses and Indemnification: | The Borrower shall pay (a) all reasonable out-of-pocket expenses of the (i) the DIP Agent and the Arranger associated with the syndication of the DIP Facilities (including the reasonable fees, disbursements and other charges of counsel) and (ii) the DIP Agent, the Arranger and the |

YCST01:10086138.1

069486.1001

DIP Lenders parties to the DIP Documentation on the Closing Date associated with the preparation, execution, delivery and administration of the DIP Documentation and any amendment or waiver with respect thereto (including the reasonable fees, disbursements and other charges of counsel), and (b) all out-of-pocket expenses of the DIP Agent and the DIP Lenders (including the fees, disbursements and other charges of counsel) in connection with the enforcement of the DIP Documentation.

The DIP Agent, the Arranger and the DIP Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. *(DIP Agreement: § 12.5)*

|  |  |
|---|---|
| 506(c) Waiver | Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of these Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (acting with the consent of the Required Lenders), the First Lien Agent (acting with the consent of the Required First Lien Lenders and the Second Lien Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, or the Second Lien Lenders. *(Interim Order: ¶ 10)* |
| Stipulations by the Debtors in respect of claims or other causes of action belonging to the estate or the trustee | The Interim Order contains certain stipulations of the Debtors (the "Debtors' Stipulations") that: |
|  | (a)  the liens and security interests granted to secure the LIFO Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the First Lien Credit Agreement) liens on and security interests in the Prepetition Collateral to the extent set forth in the First Lien Documents in respect of the LIFO Obligations, (ii) not subject to avoidance recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) which are permitted under the First Lien Documents to the extent such permitted liens are senior to the liens securing the LIFO Obligations; |
|  | (b) the liens and security interests granted by the Debtors to the First Lien Agent (for the ratable benefit of the First Lien Lenders) to secure the First Lien Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the First Lien Credit |

26

Agreement) liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to the Interim Order, the Carve-Out and the liens and security interests granted to secure the DIP Loans and the First Lien Adequate Protection Obligations, (B) prior to repayment in full of the LIFO Obligations, the liens securing the LIFO Obligations and (C) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) which are permitted under the First Lien Documents to the extent such permitted liens are senior to the liens securing the First Lien Obligations;

(c) the liens and security interests granted by the Debtors to the Second Lien Agent (for the ratable benefit of the Second Lien Lenders) to secure the Second Lien Obligations are (i) valid, binding, perfected, enforceable, second priority (subject to permitted exceptions under the Second Lien Credit Agreement) liens on and security interests in Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination (except as set forth in the Intercreditor Agreement) pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (iii) subject and subordinate only to (A) after giving effect to the Interim Order, the Carve-Out and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations, (B) prior to repayment in full of the LIFO Obligations, liens securing the LIFO Obligations, (C) liens securing the First Lien Obligations and (D) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) which are permitted under the Second Lien Documents to the extent such permitted liens are senior to the liens securing the Second Lien Obligations; and

(d) no portion of the LIFO Obligations, the First Lien Obligations and the Second Lien Obligations shall be subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law. *(Interim Order: ¶ 4)*

| | |
|---|---|
| Release, waiver or limitation on claims or other causes of action belonging to the estate or the trustee | Subject to the rights of other parties in interest set forth below, the Debtors release any claims, counterclaims, causes of action, defenses or setoff rights (other than any setoff rights under any hedge agreements in accordance with their terms), whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the LIFO Lenders, the First Lien Agent, the First Lien Lenders, the Second Lien Agent, the Second Lien Lenders, and as to each of the foregoing, their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case in connection with any matter related to the LIFO Obligations, the First Lien Obligations, the First Lien Credit Agreement, the First Lien Documents or the financing and transactions contemplated thereby, the Second Lien Obligations, the Second Lien Credit Agreement, the Second Lien Documents or the financing and transactions contemplated thereby, or the Prepetition Collateral. |

*(Interim Order: ¶ 4(g), 21)*

> Any party in interest (other than the Debtors) must commence a
> contested matter or adversary proceeding objecting to or challenging
> the Debtors' Stipulations and the Court's findings set forth in the
> Interim and Final Order by no later than the earlier of (x) the date that is
> 75 days after the Petition Date and (y) the date that is 60 days following
> the formation of the Committee; provided that any such deadline is
> subject to extension as may be specified by the Court for cause shown,
> or such party-in-interest shall be enjoined from seeking to exercise the
> rights of the Debtors' estates, including without limitation, any
> successor thereto (including, without limitation, any estate
> representative or a chapter 7 or 11 trustee appointed or elected for any
> of the Debtors). *(Interim Order: ¶ 21)*

## **Highlighted Provisions Under Local Rule 4001-2**

27.     Rule 4001-2 of the Local Rules requires the disclosure of certain provisions of

the DIP Documents and the Interim Order.  The following disclosures are intended to comply

with the requirements of the Local Rules.  The Debtors believe that the following provisions

are justified and necessary in the context and circumstances of these Cases.  Each of these

provisions is commonly found in debtor in possession financing agreements of this nature and

the DIP Lenders would not have agreed to provide the DIP Facilities absent these provisions.

(a)     Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that
grant cross-collateralization protection (other than replacement liens or other adequate
protection) to the prepetition secured creditors.  Neither the DIP Agreement nor the
Interim Order provides for cross-collateralization protection.

(b)     Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or
findings of fact that bind the estate or other parties in interest with respect to the
validity, perfection or amount of the secured creditor's prepetition lien or the waiver
of claims against the secured creditor without first giving parties in interest an
opportunity to conduct an investigation.  Although the Interim Order contains the
Debtors' stipulations with respect to the validity, perfection and amount of liens held
by the LIFO Lenders, the First Lien Lenders and the Second Lien Lenders, the Interim
Order provides that any party in interest other than the Debtors (including the statutory
committee of unsecured creditors appointed in these Cases (the "Committee")) with
standing to do so shall have until the earlier of (x) the date that is 75 days after the
Petition Date and (y) the date that is 60 days following the formation of the Committee
(such deadline being subject to extension as may be specified by this Court for cause
shown) to challenge the validity, perfection and amount of liens held by the LIFO

Lenders, the First Lien Lenders and the Second Lien Lenders. (Interim Order, ¶¶ 4, 21)

        (c)    Local Rule 4001-2(a)(i)(C) requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. While the Interim Order provides for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code with respect to the DIP Collateral and the Prepetition Collateral (subject to the Carve-Out), such waiver is effective only upon the entry of the Final Order. (Interim Order, ¶ 10)

        (d)    Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. The Interim Order does not immediately grant to any prepetition secured lenders liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code. Upon entry of the Final Order, the First Lien Lenders and the Second Lien Lenders will be granted liens only on any proceeds or property recovered in respect of the Avoidance Actions as adequate protection. (Interim Order, ¶¶ (VII), 8(a))

        (e)    Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in section 552(b) of the Bankruptcy Code. The Interim Order provides that approximately $1.9 million of the Prepetition L/Cs issued under the First Lien Credit Agreement shall be deemed to have been issued under the DIP Agreement for the administrative convenience in respect of the issuance and any amendment of such outstanding letters of credit. In addition, the Interim Order authorizes the Debtors to use the proceeds of the initial borrowing of the DIP Loans to repay the LIFO Obligations in full in the aggregate amount of approximately $2.5 million. (Interim Order, ¶¶ (III), 5, 6)

        (f)    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. Neither the DIP Agreement nor the Interim Order provides for disparate treatment of the professionals retained by the Debtors and the professionals retained by the Committee with respect to the Carve-Out.

        (g) Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured lien without the consent of that lienor. Neither the DIP Agreement nor the Interim Order provides for the priming of any secured lien without the consent of that lienor. The First Lien Lenders are consenting to the DIP Liens priming their liens in exchange for the adequate protections provided to them as described above. By virtue of the First Lien Lenders' consent to the DIP Liens, pursuant and subject to the

Intercreditor Agreement, the Second Lien Lenders will be deemed to have consented to the DIP Liens.

## Authority for Requested Relief

### Standards of Approval under Sections 364(c) and 364(d)(1) of the Bankruptcy Code

28.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

29.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1).

30.     Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

31.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider the following factors:

30

(a) unencumbered credit or alternative financing without superpriority status is available to the debtor;

(b) the credit transactions are necessary to preserve assets of the estate;

(c) the terms of the credit agreement are fair, reasonable, and adequate;

(d) the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

(e) the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); In re Crouse Group, Inc., 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

32.     For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**The Debtors Cannot Obtain Financing On More Favorable Terms.**

33.     In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the

31

remaining two lenders); see also In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

34.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

35.     Prior to the Petition Date, when the Debtors endeavored to obtain postpetition financing, it became clear that the Debtors would not be able to obtain any such financing on a non-priming basis, much less on an unsecured, administrative expense or junior secured basis, based on the amount of secured claims against the Debtors relative to the valuation of the Debtors' business.  Substantially all of the Debtors' assets are subject to the liens granted under the various agreements among the Debtors and their prepetition lenders.  Because of the extent of the prepetition lenders' secured claims, obtaining the financing needed by the Debtors as unsecured debt or debt which would be secured by liens junior to the liens of the prepetition lenders was not a realistic option.  Moreover, the Debtors' prepetition First Lien Lenders indicated that they would not consent to having their liens primed by a third party lender.  Therefore, the Debtors determined that soliciting proposals from third party lenders would be futile and that the DIP Facilities were the best financing option available to them under the circumstances.

**DIP Facilities Are Necessary to Preserve the Value of the Debtors' Estates**

36.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facilities, if approved, will provide working capital critical to funding the Debtors' day-to-day operations. Without access to the DIP Facilities, the Debtors will be forced to cease operations, which would (i) result in immediate and irreparable harm to their business, (ii) deplete the going concern value of the Debtors' business and (iii) jeopardize the Debtors' ability to implement the Plan Support Agreement. Because the Debtors' available and projected Cash Collateral is insufficient to fund their operations, the credit to be provided under the DIP Facilities is necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**Terms of DIP Facilities are Fair, Reasonable and Adequate under the Circumstances**

37.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. See Transcript of Record at 740:4-6, In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

33

38.     Given the urgent need of the Debtors to obtain financial stability for the benefit

of all parties in interest and the absence of available alternative financing, the terms of the

DIP Facilities are fair, appropriate, reasonable and in the best interests of the Debtors, their

estates and their creditors.  The DIP Documents were negotiated extensively by the Debtors

and the DIP Lenders, in good faith and at arm's length as required by section 364(e) of the

Bankruptcy Code, with all parties represented by experienced counsel.  As described above,

during the negotiations, the DIP Lenders made notable concessions regarding the terms of the

DIP Facilities, including pricing.

39.     As a condition to closing under the DIP Agreement, the Debtors are required to

repay the LIFO Obligations in full with the proceeds of the initial borrowing of the DIP

Loans.  The repayment of the LIFO Obligations with the proceeds of the DIP Loans is

justified because the Debtors would not have been able to secure the DIP Facilities they need

to stabilize their business without such condition.  Moreover, the LIFO Lenders provided the

LIFO Loans to the Debtors just two days before the Petition Date as an accommodation to

provide the Debtors with sufficient liquidity pending obtaining the DIP Loans to permit the

Debtors to enter chapter 11 in as smooth and orderly a fashion as possible under the

circumstances.

40.     The aggregate value of the Prepetition Collateral securing the LIFO

Obligations substantially exceeds the aggregate amount of the LIFO Obligations and

therefore, the LIFO Obligations are oversecured by a significant margin.  Accordingly, the

repayment of the LIFO Obligations impacts only the timing of the repayment of the LIFO

Obligations but not their ultimate recovery.  In addition, the applicable interest rate with

respect to the LIFO Loans is greater than the applicable interest rate with respect to the DIP

YCST01:10086138.1                                                                  069486.1001

Loans, so repayment of the LIFO Obligations with the initial borrowing under the DIP Loans will reduce the interest costs to the estates. Finally, the rights of parties in interest to challenge the LIFO Lenders' claims and liens are not eliminated by the repayment because the Interim Order preserves such rights during a certain period following the Petition Date as set forth therein.

41.     The proposed DIP Agreement provides that the security interests and administrative expense claims granted to the DIP Lenders are subject to the Carve-Out. In In re Ames Dep't Stores, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. Id. at 40.

42.     The Debtors agreed to pay commitment, underwriting, arranger and administrative agency fees to the DIP Agent, the Arranger and the DIP Lenders, in the aggregate amount of approximately 4% of the aggregate amount of the commitments available under the DIP Facilities. The Debtors believe that these fees are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. See, e.g., In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

43.     In addition, the deemed issuance of the Prepetition L/Cs under the DIP Agreement is appropriate to, among other things, provide for administrative convenience in respect of the issuance and any amendment of such outstanding letters of credit.

**Entry into the DIP Agreement Reflects the Debtors' Reasonable Business Judgment**

44.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment … [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); Group of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

45.     Bankruptcy courts typically defer to debtors' business judgment on the decision to borrow money unless such decision is arbitrary and capricious.  See In re Trans World Airlines, Inc. 163 B.R. at 974.  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

YCST01:10086138.1                                                                                     069486.1001

46. For the reasons set forth above, the Debtors submit that the entry into the DIP Facilities is the exercise of the Debtors' reasonable business judgment.

## Proposed Adequate Protection is Appropriate

47. To the extent a secured creditor's interests in the collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor in possession financing facility. Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

48. The proposed adequate protection is comprised of, among other things, the payment of interest, the payment of fees and expenses of the First Lien Agent (including for its counsel and financial advisors), the payment of reasonable expenses of members of the steering committee of the First Lien Lenders and the granting of replacement liens and superpriority claims for the First Lien Lenders, which are customary in this type of transactions. The Second Lien Lenders will receive as adequate protection junior replacement

37

liens and superpriority claims, in each case subject to the terms of the Intercreditor Agreement.

49.     The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the First Lien Lenders' and the Second Lien Lenders' interest in the Prepetition Collateral is fair and reasonable.  In reliance upon such adequate protection, the First Lien Lenders have consented to the priming of their prepetition liens.  The consent of the First Lien Lenders permits the Debtors to avoid potentially time consuming and unpredictable priming litigation.  The First Lien Lenders' consent to the priming of their liens thus permits the Debtors to save considerable resources, not to mention avoid a delay, in obtaining postpetition financing.  Upon the First Lien Lenders' consent to such priming liens, the Second Lien Lenders are deemed to have consented to, and have no right to object to, such priming liens pursuant and subject to the Intercreditor Agreement.   And importantly, the proposed adequate protection shall only be provided to the extent there is any diminution in value to the prepetition lenders' interest in the Prepetition Collateral.  Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to the prepetition lenders.

50.     Accordingly, pursuant to sections 364(c) and 364(d) of the Bankruptcy Code, the Debtors respectfully submit that they should be granted authority to enter into the DIP Documents and borrow from the DIP Lenders on the secured and administrative superpriority basis described herein.

### Approval of Use of Cash Collateral is Appropriate

51.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral

38

consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."

52.     The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including the Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date through and including the Termination Date pursuant to the terms of the DIP Documents. The Debtors need the Cash Collateral to pay operating expenses, including payroll and vendors, in order to ensure a continued supply of goods and services essential to the Debtors' business. Indeed, absent such relief, the Debtors' businesses will be brought to an immediate halt, with damaging consequences for the Debtors and their estates and creditors.

53.     The Debtors believe that the terms and conditions of their use of the Cash Collateral (including the provision of the adequate protection described above) are appropriate and reasonable and that such adequate protection is sufficient to secure any Adequate Protection Obligations under the circumstances. Furthermore, the First Lien Lenders have consented to the Debtors' use of Cash Collateral subject to the terms and conditions of the DIP Documents and the Interim Order. By virtue of the First Lien Lenders' consent to the Debtors' use of Cash Collateral, pursuant and subject to the Intercreditor Agreement, the Second Lien Lenders are deemed to have consented to such use of the Cash Collateral.

54.     Courts in this district have granted similar relief in other recent chapter 11 cases. See, e.g., In re Sharper Image Corp., No. 08-10322 (KG) (Bankr. D. Del. March 7, 2008); In re Buffets Holdings, Inc., No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008); In re Pope & Talbot, Inc., No. 07-11738 (CSS) (Bank. D. Del. Dec. 7, 2007); In re HomeBanc Mortgage Corp., No. 07-11079 (KC) (Bankr. D. Del. Sept. 13, 2007). Therefore, the Debtors

39

submit that they should be authorized to use the Cash Collateral on the terms set forth in this Motion.

## Modification of the Automatic Stay

55.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any event of default under the DIP Agreement, all rights and remedies provided in the DIP Agreement without further order of or application to the Court. However, the DIP Lenders must provide the Debtors and various other parties with five business days' written notice prior to exercising any enforcement rights or remedies in respect of their collateral.

56.    Stay modification provisions of this sort are common features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under these circumstances. Accordingly, the Debtors request that the Court modify the automatic stay to the extent contemplated by the DIP Agreement and the proposed orders.

## Approval of Interim Relief

57.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2); (c)(2).

58.    As described above, the Debtors have an urgent and immediate need for cash to continue to operate especially in light of the fact that August through October is the

40

Debtors' peak period for receiving shipments of goods that will be sold during the holiday shopping season. Given the immediate and irreparable harm to be suffered by the Debtors, their estates and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing on the Petition Date or as soon thereafter as practicable to consider the Debtors' application for authorization to obtain interim financing under the DIP Facilities and to use the Cash Collateral.

### Final Hearing and Form and Manner of Notice

59. The DIP Agreement requires that a Final Order approving this Motion be entered within 40 days after the Petition Date. The Debtors therefore request that the Court (i) schedule the Final Hearing no later than 30 days after the Petition Date and (ii) approve the Interim Order as adequate notice of the Final Hearing.

60. Pursuant to Bankruptcy Rule 4001, the Debtors will serve a copy of this Motion including all exhibits hereto (including the DIP Agreement but without the schedules thereto)[4] upon their thirty largest (on a consolidated basis) unsecured creditors, the DIP Agent, the First Lien Agent, the Second Lien Agent and the U.S. Trustee. The Debtors submit that such notice is adequate and sufficient.

61. The Debtors further request that the Court specify that any and all objections to this Motion (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) state the basis of such objection with specificity; (d) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801; and (e) be served upon (i) Oriental Trading Company, Inc., 5455 South 90th Street,

---

[4] The schedules will be provided to the DIP Agent, the First Lien Agent, the Second Lien Agent, the U.S. Trustee and the Committee when appointed.

Omaha, Nebraska 68127 (Attn: Robert R. Siffring, General Counsel), Facsimile: (402) 331-3873; (ii) co-counsel to the Debtors, Debevoise & Plimpton LLP, 919 Third Avenue, New York, New York 10022 (Attn: Richard F. Hahn, Esq. and My Chi To, Esq.); Facsimile: (212) 909-6836; (iii) co-counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware 19899 (Attn: Joel A. Waite, Esq.), Facsimile: (302) 571-1253; (iv) counsel to the Committee, if and when appointed; (v) counsel to the DIP Agent and the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017 (Attn: Steven Fuhrman, Esq. and Elisha Graff, Esq.), Facsimile: (212) 455-2502 and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq.), Facsimile: (302) 498-7531; (vi) counsel to the Second Lien Agent, Kramer, Levin, Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036 (Attn: Thomas Moers Mayer, Esq.), Facsimile: (212) 715-8000; and (vii) the U.S. Trustee, in each case to allow actual receipt by the foregoing no later than seven business days prior to the date of the Final Hearing.

YCST01:10086138.1                                                                 069486.1001

WHEREFORE, the Debtors respectfully request entry of the Interim Order in the form

attached hereto as Exhibit B.


Dated:   Wilmington, Delaware
          August 25, 2010

                                          Joel A. Waite (No. 2925)
                                          Kenneth J. Enos (No. 4544)
                                          YOUNG CONAWAY STARGATT & TAYLOR,
                                          LLP
                                          The Brandywine Building
                                          1000 West Street, 17th Floor
                                          P.O. Box 391
                                          Wilmington, Delaware 19899
                                          Telephone: (302) 571-6600
                                          Facsimile: (302) 571-1253

                                          – and –

                                          Richard F. Hahn
                                          My Chi To
                                          DEBEVOISE & PLIMPTON LLP
                                          919 Third Avenue
                                          New York, New York 10022
                                          Telephone: (212) 909-6000
                                          Facsimile: (212) 909-6836

                                          PROPOSED ATTORNEYS FOR THE DEBTORS
                                          AND DEBTORS IN POSSESSION