**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

----------------------------------------------------------------- x

In re:                                                        : Chapter 11
                                                                  :
OTC HOLDINGS CORPORATION,                 : Case No. 10-12636 (BLS)
*et al.*,[1]                                                   :
                      Debtors.                          : Joint Administration Pending
                                                                  :
                                                                  : Re: D.I. 12
                                                                  :
----------------------------------------------------------------- x

**LIMITED OBJECTION OF WILMINGTON TRUST FSB TO DEBTORS'
MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§
105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e)
AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I)
AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION
FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION
TO PREPETITION SECURED LENDERS AND (IV) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)**

Wilmington Trust FSB (successor to Wachovia Bank, National Association), as

administrative and collateral agent ("Second Lien Agent") for the lenders (the "Second Lien

Lenders") under the Second Lien Credit Agreement dated as of July 31, 2006 (the "Second Lien

Credit Agreement"), respectfully submits this Limited Objection (this "Objection") to the Motion

of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for

Interim and Final Orders Under 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1), 364(e), and 507 and Bankruptcy Rules 2002, 4001, and 9014 (I)

Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use

---

[1]  The Debtors in these Cases, along with the last four digits of each Debtor's federal tax identification number, are:  OTC Holdings Corporation, a Delaware corporation (0174); Oriental Trading Company, Inc., a Delaware corporation (5603); OTC Investors Corporation, a Delaware corporation (0180); Fun Express, Inc., a Nebraska corporation (7942); and Oriental Trading Marketing, Inc., a Nebraska corporation (0923).  The location of the Debtors' corporate headquarters and the service address for all the Debtors is 5455 South 90th Street, Omaha, Nebraska 68127.

Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Lenders and (IV) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) [Docket No. 12] (the "DIP and Cash Collateral Motion"), and respectfully submit as follows:[2]

**Preliminary Statement**

The instant motion seeks approval for a debtor-in-possession loan and use of cash collateral at the cost of committing the Debtors to a specific plan of reorganization as set forth in the Plan Term Sheet. By agreeing to the Plan Term Sheet at this time, the Debtors have effectively abandoned their pursuit of maximum value for the estates in favor of a cram-down plan that benefits the First Lien Lenders. The DIP Facilities seek to impose on the Debtors and these cases a number of default triggers that improperly leverage the bankruptcy process in favor a premature plan of reorganization advocated by the First Lien Lenders. The Second Lien Agent therefore objects to DIP Agreement to the extent that it conditions such financing, through the imposition of events of default or otherwise, on the Debtors' adherence to specific milestones for a plan of reorganization providing little or no recovery to the Second Lien Lenders.

**FACTS**

1.      As described in the DIP and Cash Collateral Motion, as of the Petition Date, pursuant to the First Lien Documents, the First Lien Lenders are owed in excess of $403 million (exclusive of the LIFO Loans). Pursuant to the Second Lien Documents, the Second Lien Lenders are owed in excess of $186 million. Each of the First Lien Obligations and Second Lien Obligations are secured by the Prepetition Collateral.

2.      The relationship between the First Lien Lenders and the Second Lien Lenders is governed by the Intercreditor Agreement, under which the Second Lien Lenders waive various

---

[2]      All capitalized terms not defined herein have the same meaning as defined in the DIP and Cash Collateral Motion.

rights and provide various consents. Whether these waivers and consents are consistent with applicable law need not be addressed in this Objection because Section 5.2 of the Intercreditor Agreement specifically permits the Second Lien Lenders and the Second Lien Agent to object to the instant motion.

3.     Section 5.2 of the Intercreditor Agreement states, in relevant part, that:

> the Second Priority Representative and the Second Priority Secured Parties retain the right to object to (i) any ancillary agreements or arrangements regarding the cash collateral use or DIP Financing that are materially and disproportionately prejudicial to their interests as compared to the First Priority Secured Parties, (ii) **the DIP Financing to the extent that (x) it compels the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document** or (y) the aggregate principal amount of loans and letter of credit accommodations outstanding or available under such DIP Financing exceeds an amount equal to $50,000,000 or (iii) the DIP Financing documentation or cash collateral order to the extent that it expressly requires the liquidation of the Common Collateral prior to a default under the DIP Financing documentation or cash collateral order.

Intercreditor Agreement § 5.2 (emphasis added).

4.     On the Petition Date, the Debtors filed the DIP and Cash Collateral Motion, seeking authority, (a) to use cash collateral and (b) to obtain postpetition financing facilities (the "DIP Facilities") in an aggregate amount not to exceed $40 million, consisting of a $33.5 million term loan facility and a $6.5 million revolving facility, including $22.5 million on an interim basis. Under the DIP Agreement, the following items constitute events of default:

> (o)     The Debtors shall not have filed the Plan of Reorganization and the Disclosure [S]tatement [sic.] with the Bankruptcy Court on or before 30 days following the Petition Date; or

> (p)     The Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Required Lenders, approving the Disclosure Statement on or before 75 days following the Petition Date; or

(q)     The Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Required Lenders, confirming the Plan of Reorganization on or before 125 days following the Petition Date; or

(r)     The Effective Date shall not have occurred on or before 135 days after the Petition Date; or

(s)     Filing of any plan of reorganization that is materially inconsistent with the Plan of Reorganization;

DIP Agreement § 8(o)-(t). The "Plan of Reorganization" is defined by reference to the "Plan Support Agreement" (DIP and Cash Collateral Motion at ¶5), pursuant to which the Debtors seek to implement a cram-down plan, leaving the Second Lien Lenders with little to no recovery.[3] Attached as an exhibit to First Day Declaration, the Plan Term Sheet provides that the First Lien Lenders would receive approximately $200 million in new secured loans and 100% percent of the equity interests in the reorganized Debtors on account of their claims. See First Day Declaration at Ex. B (Plan Term Sheet). For their claims, Second Lien Lenders are to be offered three-year warrants to purchase an aggregate of 2.5% of the new common stock of the Debtors at an enterprise value strike price of $427.5 million. Id.

---

[3]     The DIP Agreement includes the following relevant definitions:

"Plan of Reorganization": a Plan of Reorganization proposed by the Debtors which is consistent with the Plan Support Agreement, or which is otherwise in form and substance reasonably satisfactory to the Required Lenders.

"Plan Support Agreement": the Plan Support Agreement, dated as of August 19, 2010, by and among the Debtors and certain of the holders of claims against the Debtors arising under the Prepetition First Lien Credit Agreement, as amended, supplemented or otherwise modified from time to time in accordance therewith.

DIP Agreement § 1.1.

## ARGUMENT

**The Second Lien Agent and Second Lien Lenders May Object to the DIP and Cash Collateral Motion under the Intercreditor Agreement**

5.      The Debtors' statements in the DIP and Cash Collateral Motion that the Second Lien Lenders are deemed to have consented to the DIP Facilities (DIP and Cash Collateral Motion at ¶¶ 24, 49, 53) are inaccurate.  As described above, the Second Lien Agent's and the Second Lien Lenders' ability to object to the instant relief is specifically permitted by Section 5.2 of the Intercreditor Agreement, because, among other things, the Plan Support Agreement, which includes a term sheet for the proposed plan of reorganization, is a document "related" to the DIP Facilities (i.e., the provision of the DIP Facilities is a part of the Plan Term Sheet) and compels the Debtors "to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms" are set forth therein.  See Intercreditor Agreement § 5.2(ii)(x).  Namely, the Debtors must pursue a cram-down plan that does not provide meaningful value to Second Lien Lenders, or else they risk defaulting under the DIP Facilities.  See DIP Agreement § 8(o)-(s).  Accordingly, contrary to the Debtors' assertion, the Second Lien Lenders and the Second Lien Agent have not (and cannot be deemed to have) consented to the relief requested in the DIP and Cash Collateral Motion.

**The First Lien Lenders Will Not be Prejudiced if the DIP and Cash Collateral Motion is Approved without Mandating Pursuit of a Plan of Reorganization Consistent with the Plan Term Sheet Attached to the Plan Support Agreement**

6.      Bankruptcy courts have substantial discretion in approving debtor-in-possession financing under section 364 of the Bankruptcy Code.  See In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990) (approving debtor-in-possession financing only after proposed onerous provisions were modified).  In considering whether the terms of debtor-in-possession financing are fair, reasonable

and adequate, courts consider the given circumstances of the debtor-borrower and the proposed lender relationship, including whether the proposed financing is primarily for the economic benefit of the proposed lender. In re Ames Dep't Stores, Inc., 115 B.R. at 37.

7. Notwithstanding the Debtors' proposal to waive the protections under section 506(c) of the Bankruptcy Code, these cases are being stewarded to a conclusion that will primarily benefit the First Lien Lenders (masquerading as DIP Lenders), at the expense of exploring all options that may lead to better treatment of all creditors. The DIP Agreement's added insult – the tying of the extension of the DIP Facilities to the prosecution of a specific plan of reorganization on an abbreviated timeline– is an improper tariff in favor of the First Lien Lenders. Under the proposed framework, although the Debtors claim that they "maintain the right to implement an alternative restructuring if, in the exercise of their fiduciary duties, the Debtors determine that such alternative restructuring is more favorable to the Debtors' estates, creditors and other stakeholders," (DIP and Cash Collateral Motion at ¶7), this fiduciary out is illusory. Should the Debtors exercise such a right under the Plan Support Agreement and pursue a plan of reorganization materially inconsistent with the Plan Term Sheet, they would be in immediate default under the DIP Facilities, and faced with the prospect of being unable to finance such a restructuring. Such restrictions are inappropriate and simply unnecessary, in light of the myriad of protections provided to the DIP Lenders, including the ability to fix the duration of the commitment (proposed at six months) and to control the Debtors' budget, which ultimately will dictate how the long the Debtors chapter 11 proceedings will last and, by implication, the date by when any plan of reorganization must be confirmed.

8. Moreover, under the imposed cram-down plan, there is a real possibility that the First Lien Lenders could be paid in excess of their claims. Under section 1129(b)(1) and its

accompanying legislative history, "[o]ne requirement applies generally to all classes before the court may confirm under this subsection. No class may be paid more than in full." H.R. Rep. No. 595, 95th Cong., 1st Sess. 414 (1977); see also In re Exide Techs., 303 B.R. 48, 61 (Bankr. D. Del. 2003) (noting that Courts have decided that "a corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del. 2001) (same). This type of hoarding of value is not permitted by the Bankruptcy Code and the Second Lien Agent reserves its right (and on behalf of Second Lien Lenders, their rights) to contest the implementation of such a plan, on these grounds, among others.

## CONCLUSION

For the reasons set forth herein, the Second Lien Agent respectfully requests that the Court: (i) authorize the Debtors to enter into the DIP Facilities only on the condition that Debtors are free to pursue any type of value-maximizing restructuring consistent with the Bankruptcy Code; and (ii) grant such other relief as appropriate.

Dated: Wilmington, Delaware
August 26, 2010

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: 302 658-3989

-and-

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Thomas Moers Mayer
Robert T. Schmidt
Elan M. Daniels
1177 Avenue of the Americas
New York, NY 10036
(212) 715-9100

*Counsel to Wilmington Trust FSB, as Second Lien Agent*