IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
                                                                 :
In re:                                                           : Chapter 11
                                                                 :
OTC HOLDINGS CORPORATION,                                        : Case No. 10-12636 (BLS)
et al.,[1]                                                       :
         Debtors.                                                : Jointly Administered
                                                                 :
---------------------------------------------------------------- x  Ref. Docket Nos.: 12, 27, 60, 80

## DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR INTERIM AND FINAL ORDERS UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) AND 507 AND BANKRUPTCY RULES 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS AND (IV) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c)

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby submit this reply (the "Reply") in support of their motion (i) authorizing the Debtors to obtain postpetition financing; (ii) authorizing the Debtors' use of cash collateral; (iii) granting adequate protection to prepetition secured lenders; and (iv) scheduling a final hearing on the Debtors' proposed debtor in possession financing (the "DIP Motion") [Docket No. 12].[2] In support of this Reply, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: OTC Holdings Corporation, a Delaware corporation (0174); Oriental Trading Company, Inc., a Delaware corporation (5603); OTC Investors Corporation, a Delaware corporation (0180); Fun Express, Inc., a Nebraska corporation (7942); and Oriental Trading Marketing, Inc., a Nebraska corporation (0923). The location of the Debtors' corporate headquarters and the service address for all the Debtors is 5455 South 90th Street, Omaha, Nebraska 68127.

[2] Capitalized terms used herein without definition shall have the meaning specified in the DIP Motion.

## Preliminary Statement

1.  After months of diligent but unsuccessful efforts to reach a consensual restructuring with the First Lien Lenders and the Second Lien Lenders and a comprehensive but similarly unsuccessful sale process,[3] the Debtors negotiated a restructuring with the First Lien Lenders and then promptly filed their Chapter 11 petitions to implement such restructuring. The material terms of this restructuring are reflected in a plan support agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Support Agreement") between the Debtors and certain First Lien Lenders. Under the Plan Support Agreement, certain First Lien Lenders agreed to support the proposed restructuring of the Debtors set forth in the plan term sheet attached to the Plan Support Agreement (as amended, supplemented or otherwise modified from time to time, the "Plan Term Sheet") and to provide the DIP financing which is the subject of the DIP Motion.

2.  The only objection to the DIP Motion is a limited objection (the "Objection") by the Second Lien Agent (the "Objector") [Docket No. 27; 80 (renewal of the Objection)].[4] The Objection asserts on behalf of the Second Lien Lenders that the DIP Motion should be denied "to the extent that" the DIP Financing "compels [the Debtors] to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing Documentation or a related document." More specifically, the Objector takes issue with the plan milestones set forth in Sections 8(o) through 8(t) of the DIP Agreement, which

---

[3] These restructuring efforts and the sale process are described in the attached September 15, 2010 Declaration of Michael Henkin.

[4] The Debtors have discussed with the Unsecured Creditors' Committee (the "Committee") its comments on the DIP Motion and believe that they have addressed all of the Committee's comments.

2
YCST01:10160016.1            069486.1001

state that an event of default will occur under the DIP Agreement if the Debtors have not, among other things, filed and ultimately obtained confirmation of "the Plan of Reorganization" by the specified deadlines.

3. The Objection should be denied for several reasons. Not only are the Second Lien Lenders contractually precluded from asserting this objection, but the Objection also has no merit.

4. The Second Lien Lenders concede that, under their Intercreditor Agreement with the First Lien Lenders [DIP Motion, Ex. C, Docket No. 12-3], they have waived various rights and agreed to provide various consents, including, in connection with Chapter 11 cases, rights and consents related to DIP financing. Objection at p. 2-3. Yet, they argue that, under an exception in the Intercreditor Agreement, they nevertheless retained the right to make this Objection. The exception upon which they rely does not apply here for two reasons. First, the DIP Agreement does not "compel[] the Borrower to seek confirmation of *a specific plan of reorganization*." Second, fewer than "*substantially all of the material terms* [for the plan of reorganization] *are set forth* in the DIP Financing documentation or a related document."

5. The Objection should also be denied on the merits. First, by entering into the Intercreditor Agreement with the First Lien Lenders, the Second Lien Lenders agreed that, before any distribution to them, the First Lien Lenders must be "indefeasibly paid in cash in full." This is precisely the outcome anticipated by Plan Term Sheet. Indeed, the Plan Term Sheet itself provides that as an alternative to the treatment set forth in it, the First Lien Lenders would consent to any other plan of reorganization that provides for payment in full of the First Lien Lenders' claims. Having agreed in the Intercreditor Agreement to such outcome, the

3

YCST01:10160016.1                                                                                          069486.1001

Second Lien Lenders now cannot show how the same outcome, when it flows from a plan confirmed in this case, would result in any prejudice.

6. Moreover, the Objector fails to cite any relevant or controlling authority and disregards recent rulings from this jurisdiction approving DIP loans with similar terms.

## Argument

### I. The Second Lien Lenders are Contractually Precluded from Raising The Objection

7. Under the terms of the Intercreditor Agreement, the Second Lien Lenders are deemed to have consented to the DIP Facilities and have waived their right to object to them. Intercreditor Agreement, § 5.2. Contrary to their argument, the exception in Section 5.2 of the Intercreditor Agreement on which they rely does not apply.

8. Under that exception, the Second Lien Lenders retain the right to object to the DIP Facilities "to the extent that . . . it compels the Borrower to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Financing documentation or a related document." Intercreditor Agreement, § 5.2.

9. For that exception to apply, the Second Lien Lenders would have to show that (i) the DIP Facilities "compels the Borrower to seek confirmation of *a specific plan of reorganization*"; and (ii) at least "*substantially all of the material terms* [for the plan of reorganization] *are set forth* in the DIP Financing documentation or a related document." Here, neither of these requirements is met.

#### A. The DIP Agreement Does Not Seek Confirmation "of a Specific Plan of Reorganization"

10. First, the DIP Agreement does not seek confirmation "of a specific plan of reorganization." What the DIP Agreement states is that failure to meet certain deadlines related

4

to the filing and approval of the "Plan of Reorganization" constitutes an event of default. However, as the Objector itself points out (Objection at p. 4, n.3), the "Plan of Reorganization" is defined as *either* "a Plan of Reorganization proposed by the Debtors which is consistent with the Plan Support Agreement" *or* a plan of reorganization "which is otherwise in form and substance reasonably satisfactory to the Required Lenders." Presumably, any plan of reorganization that provides for payment in full of the claims under the DIP Facilities would be reasonably satisfactory to the Required Lenders.

11. Moreover, the first alternative definition of the "Plan of Reorganization" refers to a plan that is merely "consistent with" the Plan Support Agreement. And the Plan Support Agreement itself contemplates that the First Lien Lenders would be either paid in full in cash *or* receive equity in the reorganized Debtors and new term loans. Therefore, not only is the DIP Agreement not tied to a "specific" plan, the Plan Support Agreement itself contemplates two alternative plans.

12. Also, as the Objection notes, the Plan Support Agreement expressly recognizes that the Debtors will retain a "fiduciary out." It provides that the Debtors may terminate the agreement if their board of directors, in the exercise of its fiduciary duties, determines in good faith that a Business Combination (as defined therein, and including a sale of substantially all of the Debtors' assets) is more favorable to the Debtors' estates and creditors and other stakeholders than the restructuring contemplated by the Plan Support Agreement.

13. Contrary to the Objector's characterization (Objection at p. 6), if the Debtors chose to exercise their rights under the "fiduciary out" provision, they would not be in "immediate" default under the DIP Agreement. While the timetable built into the events of

5
YCST01:10160016.1                                                                                                                         069486.1001

default in the DIP Agreement requires that, to avoid a default under the DIP Agreement, the Debtors comply with certain deadlines related to the filing and confirmation of the Plan of Reorganization (as defined in the DIP Agreement), there is nothing in the DIP Agreement that says that an event of default would result from the Debtors' receipt, consideration, and negotiation of an alternative proposal. Moreover, depending on when the alternative offer is received, the timetable that is built into the DIP Agreement would give the Debtors several weeks to seek and obtain replacement DIP financing. For example, if the Debtors were to receive a proposal for an alternative transaction on September 20, the date of the hearing with respect to the DIP Motion, the Debtors would have until November 8—49 days—to negotiate that proposal and obtain replacement DIP financing so long as they filed a conforming plan of reorganization and disclosure statement with the Court on or before September 24.

14. The Debtors believe that these provisions, which were heavily negotiated, provide them with the flexibility to appropriately pursue any alternative transaction that might emerge. Therefore, contrary to the Objector's assertion, the "fiduciary out" provision is not "illusory." Objection at p. 6.

### B. The Plan Support Agreement Does Not Set Forth "Substantially All" Material Terms of the Plan

15. Second, while the Plan Support Agreement sets forth some material terms of a plan of reorganization, it does not set forth "substantially all" material terms. Most notably, it does not specify the treatment of general unsecured creditors, a subject the Debtors and the First Lien Lenders anticipate discussing with the recently formed Official Committee of Unsecured Creditors. In addition, the Plan Support Agreement does not specify many other material terms of a plan of reorganization, including the interest rates and fees to be charged under, or

6

the covenants, events of default and other material terms to be contained in, either the New Term Loans or the Exit Facility; or the terms and conditions of the stockholders and registration rights agreements to be entered into with the First Lien Lenders.

## II. The DIP Motion Should Be Granted and the Objection Should Be Rejected on the Merits

### A. There Is No Prejudice to the Second Lien Lenders

16. The Second Lien Lenders' objection should also be rejected on its merits. Even if the DIP Agreement could be said to "compel[] the Borrower to seek confirmation of a specific plan of reorganization," that would not be a sufficient basis for granting the relief sought by the Objector.

17. As an initial matter, if the confirmed plan treats the First and Second Lien Lenders' claims in accordance with the terms in the Plan Support Agreement, such respective treatment would not cause the Second Lien Lenders any prejudice. This is because, by entering into the Intercreditor Agreement, the Second Lien Lenders already agreed that the First Lien Lenders would be "indefeasibly paid in cash in full" before the Second Lien Lenders received any recovery. For example, the Intercreditor Agreement provides that all proceeds of the "Common Collateral"—which consists of substantially all of the Debtors' assets—shall be distributed first to the First Lien Lenders. Intercreditor Agreement, § 4.1.[5]

18. The outcome provided for in the Plan Support Agreement would be no different. As already noted, the Plan Support Agreement provides for alternative treatments of the First

---

[5] Similarly, Section 5.9 of the Intercreditor Agreement precludes the Second Lien Lenders from supporting or voting in favor of any plan of reorganization that does not provide for the payment in full in cash of the claims of the First Lien Lenders.

Lien Lenders' claims, including payment "in full in cash on the Plan effective date." *See* Plan Term Sheet at p. 3.[6]

19. To the extent that the Objector contends that the First Lien Lenders "could" be paid in excess of their claims (Objection at p. 6, ¶ 8), this is an objection more properly raised at a confirmation hearing. In addition, this contention is belied by the outcome of the pre-petition marketing process.[7] Moreover, any such concern is fully addressed by the Second Lien Lenders' ability, under the plan envisioned in the Plan Support Agreement, to pay the First Lien Lenders' claims in full in cash on the plan effective date.

### B. The Second Lien Lenders' Argument Has No Legal Basis and Is Undermined By the Court's Prior Rulings

20. While it is true that, in approving debtor-in-possession financing, courts have substantial discretion, the Objector's suggestion that the DIP Agreement here is inappropriate under the applicable legal standard is incorrect.

21. *In re Ames Dep't Stores, Inc.*—the primary case on which the Objector seems to rely—did not involve DIP provisions of the type that the Objector challenges here. *In re Ames Dep't Stores, Inc.*, 115 BR 34, 37-40 (Bankr. S.D.N.Y. 1990). Moreover, even if *Ames* were factually relevant, it is a decision of the Bankruptcy Court for the Southern District of New York and does not appear to have been cited in a single decision by this Court, the United States

---

[6] In addition, under Section 4.4 of the Intercreditor Agreement, the Second Lien Lenders currently have the option to purchase the First Lien Lenders' claims at par.

[7] Within a few months of filing these cases, in an effort to maximize the value of the Debtors for the benefit of all stakeholders, the debtors conducted with the help of their financial advisor a comprehensive two-stage marketing process. See attached September 15, 2010 Declaration of Michael Henkin, ¶ 6. Of the 70 initial potential bidders, 3 parties submitted offers to acquire the Debtors. *Id.* ¶¶ 7-9. Each of the three offers was below the amount necessary to satisfy in full the Debtors' obligations to the First lien lenders. *Id.*

District Court for the District of Delaware or the United States Court of Appeals for the Third Circuit.

22. Further, in insisting that the timetable requirements under the DIP Agreement are somehow inappropriate, the Objector fails to cite a single case from this jurisdiction.[8] This is not surprising, given that multiple courts within this jurisdiction have *approved* DIP facilities with similar terms. *See, e.g.*, Final DIP orders in *In re Neenah Enters., Inc.*, No. 10-10360 (MFW) (Bankr. D. Del. Mar. 9, 2010) (event of default if plan of reorganization reflecting in all material respects the plan of reorganization attached to lock-up agreement not confirmed and consummated by certain deadlines); *In re Zohar Waterworks, LLC*, No. 09-11179 (BLS) (Bankr. D. Del. Apr. 28, 2009) (event of default if sale approved to purchaser other than DIP lender); *In re Foamex Int'l Inc.*, No. 09-10560 (KJC) (Bankr. D. Del. March 18, 2009) (make-whole payment due upon any prepayment of the DIP prior to scheduled maturity other than pursuant to a sale to DIP lender and in accordance with an asset purchase agreement acceptable to DIP lender); *In re American LaFrance, LLC*, No. 08-10178 (BLS) (Bankr. D. Del. Feb. 26, 2008) (event of default under final DIP order if sale or other disposition of all or substantially all of the collateral other than proposed sale to DIP lender); and *In re BT Tires Group Holding, LLC*, No. 09-11173 (CSS) (Bankr. D. Del. Apr. 24, 2009) (absent consent of agent, event of default if sale or bid procedures approved other than pursuant to asset purchase agreement with DIP lender or if borrower or any guarantor seeks, supports or fails to contest such approval).

---

[8] The Objector does cite a handful of opinions by courts within the Third Circuit but for a different proposition.

## Conclusion

For the foregoing reasons, the Debtors respectfully request that the Court (a) enter the proposed Final DIP Order; (b) deny the Objection to the extent any objections contained therein have not been withdrawn or resolved; and (c) grant such other relief as is just and proper.

Dated: Wilmington, Delaware
September 15, 2010

/s/ Joel A. Waite

Joel A. Waite (No. 2925)
Kenneth J. Enos (No. 4544)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

– and –

Richard F. Hahn
My Chi To
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 909-6000
Facsimile: (212) 909-6836

PROPOSED ATTORNEYS FOR THE DEBTORS AND
DEBTORS IN POSSESSION